STATE OF NORTH CAROLINA v. DONNA SUE WESTBROOKS

No. 428A94

(Filed 6 December 1996)

## 1. Criminal Law § 1131 (NCI4th Rev.)— Fair Sentencing Act—same evidence not used twice—second finding in explanation of first

The trial court did not use the same evidence to prove more than one aggravating factor when sentencing defendant for conspiracy to murder and solicitation to murder under the Fair Sentencing Act where the trial judge marked the box which provided that "defendant took advantage of a position of trust or confidence to commit the offense" and the box for additional factors, typing in that defendant took advantage of a position of trust in the husband-wife relationship with information about insurance coverage and where the victim would be when the attack occurred. The language inserted in the form in the second finding is explanatory of the first and was not treated as a separate factor in aggravation. This case is distinguishable from *State v. Morston*, 336 N.C. 381, in that there is no discrepancy between the sentencing form and the transcript.

**Am Jur 2d, Criminal Law §§ 525 et seq.**

**Validity of statutes prohibiting or restricting parole, probation, or suspension of sentence in cases of violent crimes. 100 ALR3d 431.**

## 2. Homicide § 73 (NCI4th)— solicitation to commit murder— lesser included offense of accessory before the fact

Solicitation to commit murder is a lesser included offense of murder as an accessory before the fact because solicitation to commit murder contains no element that is not also present in the offense of being an accessory before the fact to murder. Although there is a possibility under particular facts that a defendant may have solicited someone to commit a crime without being an accessory before the fact to that crime or that a defendant was an accessory before the fact to the crime but did not solicit the crime, North Carolina case law is clear that the determination of whether one offense is a lesser included offense of another is made on a definitional basis as opposed to a factual basis. Applying the definitional approach to these two crimes leads to

the result that solicitation to commit murder merges into the offense of being an accessory before the fact to the same murder.

**Am Jur 2d, Homicide § 564.**

**Solicitation to commit crime against more than one person or property, made in single conversation as single or multiple crimes. 24 ALR4th 1324.**

3. **Indictment, Information, and Criminal Pleadings § 19 (NCI4th); Homicide § 138 (NCI4th)— indictment for murder— acting in concert theory—conviction as accessory— indictment sufficient**

An indictment for acting in concert to commit murder supported a verdict of first-degree murder on an accessory-before-the-fact theory. An indictment must allege all of the essential elements of the crime sought to be charged but allegations beyond the essential elements are irrelevant and may be treated as surplusage. Moreover, the purposes of an indictment include giving notice of the charge against defendants so that they may prepare their defense and be in a position to plead double jeopardy. Here, acting in concert was an allegation beyond the essential elements of the crime charged and defendant had notice of the first-degree murder charge against her and presented her defense accordingly, testifying that she did not hire anyone to murder her husband.

**Am Jur 2d, Indictments and Informations §§ 103-106.**

4. **Evidence and Witnesses § 959 (NCI4th)— murder—statements to witnesses by victim—state of mind**

The trial court did not err in a prosecution for first-degree murder by admitting testimony repeating statements made to witnesses by the victim before his death about his feelings towards his marriage to the defendant and that he was depressed, lonely, and upset about finances. These statements reflect a man concerned about his marriage and his wife's handling of their finances and expressed his state of mind. The statements were not merely a recitation of facts and the inconsistencies present in the hearsay evidence in *State v. Hardy*, 339 N.C. 207, are not present here. These statements also corroborate a motive for the murder—that defendant was in debt and could not repay her obligations. Moreover, there was no prejudice because other witnesses testified to the same affect. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Homicide §§ 536-540.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declarant's mental, emotional, or physical condition. 75 ALR Fed. 170.**

5. **Evidence and Witnesses § 959 (NCI4th)— murder—statements by victim—state of mind**

A first-degree murder victim's statements to witnesses concerning telephone calls and bills from creditors he knew nothing about and concerning defendant's role in his financial situation were admissible as statements of the declarant's then existing state of mind. Although defendant argued that these statements were a recitation of facts rather than state of mind, these statements were made contemporaneously with and in explanation of the victim's statements that he was concerned and upset about his finances, which were held admissible elsewhere in this opinion. Moreover, there was no prejudice because other witnesses testified to the same affect.

**Am Jur 2d, Homicide §§ 536-540.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declarant's mental, emotional, or physical condition. 75 ALR Fed. 170.**

6. **Evidence and Witnesses § 2750.1 (NCI4th)— murder— statement of victim about marriage—admissible to contradict defendant**

A first-degree murder victim's statements to witnesses concerning the status of the marriage between the victim and defendant were admissible to contradict defendant's contention at trial that she and the victim had no marital problems. Moreover, there was no prejudice because other witnesses testified to the same affect.

**Am Jur 2d, Witnesses §§ 717, 718.**

7. **Evidence and Witnesses § 761 (NCI4th)— murder—statements to victim about defendant—no prejudice**

There was no prejudicial error in a first-degree murder prosecution in the admission of statements to the victim by witnesses

about defendant. Given the overwhelming evidence against defendant, there is no reasonable possibility that a different result would have been reached had this evidence not been admitted.

**Am Jur 2d, Appellate Review §§ 753, 759.**

8. **Constitutional Law § 356 (NCI4th)— first-degree murder— defendant's prearrest silence—right to remain silent not invoked**

There was no error in a first-degree murder prosecution in which defendant was charged with murdering her husband in the admission of statements made by defendant to a detective before her arrest, in the cross-examination of defendant about those statements, and in the argument of the prosecutor about the statements. The record reveals that defendant never invoked or relied upon her right to remain silent, frequently talked with investigators, and was not induced to remain silent before her arrest. Use of her prearrest silence does not violate her Fifth Amendment rights.

**Am Jur 2d, Criminal Law §§ 791-797.**

**Admissibility of pretrial confession in criminal case— Supreme Court cases. 16 L. Ed. 2d 1294.**

**Admissibility of pretrial confession in criminal case— Supreme Court cases. 22 L. Ed. 2d 872.**

9. **Evidence and Witnesses § 1092 (NCI4th)— first-degree murder—defendant's prearrest silence—impeachment**

There was no error in a first-degree murder prosecution in which defendant was charged with murdering her husband in the admission of statements made by defendant to a detective before and after her arrest, in the cross-examination of defendant about those statements, and in the argument of the prosecutor about the statements. Under common law rules, it would have been natural for defendant to have told officers about a conversation in which she was told the identity of the person who killed her husband. Her silence about this conversation was evidence of an inconsistent statement and it was not error to allow the prosecutor's cross-examination of defendant on this issue. Assuming that it would not have been natural for defendant to have told officers

about the facts set out in the statement, any error was not preju-
dicial given the overwhelming evidence against defendant.

**Am Jur 2d, Criminal Law §§ 791-797.**

**Impeachment of defendant in criminal case by showing
defendant's prearrest silence—state cases. 35 ALR4th 731.**

10. **Evidence and Witnesses § 1092 (NCI4th)— first-degree
murder—defendant's postarrest silence—used for im-
peachment purposes**

The trial court did not err in a first-degree murder prosecu-
tion by using defendant's post-arrest, post-*Miranda* silence for
impeachment where the record discloses that defendant was not
induced to remain silent, executed a waiver and voluntarily gave
a statement to investigating officers. Any references to omissions
or inconsistencies in statements defendant made after receiving
her *Miranda* warnings were proper.

**Am Jur 2d, Criminal Law §§ 791-797.**

**Impeachment of defendant in criminal case by showing
defendant's prearrest silence—state cases. 35 ALR4th 731.**

11. **Evidence and Witnesses § 1092 (NCI4th)— first-degree
murder—defendant's silence—no prejudice from use**

The use of a first-degree murder defendant's silence before
and after arrest for substantive purposes was not prejudi-
cial, assuming error, given the overwhelming evidence against
defendant.

**Am Jur 2d, Criminal Law §§ 791-797.**

**Impeachment of defendant in criminal case by showing
defendant's prearrest silence—state cases. 35 ALR4th 731.**

12. **Criminal Law § 432 (NCI4th Rev.)— murder—prosecutor's
closing argument—defendant's pre- and post-arrest silence**

There was no error in the trial court not intervening *ex mero
motu* in the prosecutor's closing argument in a first-degree mur-
der prosecution where defendant contended that the argument
plainly urged the jury to draw meaning from defendant's pre- and
post-arrest silence but defendant did not object to this portion of
the closing argument and the argument was made to impeach
defendant's trial testimony. Based on defendant's trial testimony,
the natural tendency would be for defendant to have mentioned

certain information prior to taking the stand and it was proper to raise this question.

**Am Jur 2d, Trial § 648.**

**13. Evidence and Witnesses § 2865 (NCI4th)— murder—cross-examination of State's witnesses—plea bargains—before jury—other testimony**

The trial court did not abuse its discretion in a first-degree murder prosecution where defendant contends that the trial court erred by limiting her right to confront, cross-examine, and impeach State's witnesses, thereby precluding inquiry about their parole eligibility under their guilty pleas. Both witnesses testified that they were motivated to testify for the State because of a plea arrangement and the fact that these witnesses had made arrangements for charge reductions in exchange for their testimony was clearly before the jury.

**Am Jur 2d, Witnesses § 804.**

**14. Evidence and Witnesses § 2641 (NCI4th)— plea bargain— offer of proof—attorney's testimony—privilege invoked**

There was no prejudicial error in a first-degree murder prosecution where defendant contended that the trial court erroneously allowed the attorney for a State's witness to invoke the attorney-client privilege during an offer of proof concerning parole eligibility information. Assuming that the client waived the privilege, defendant cannot show prejudice because the client had testified that the State permitted her to plead guilty to conspiracy to commit murder and second-degree murder in exchange for her testimony and read to the jury terms of her plea agreement. Any testimony by the attorney to the effect that the State's witness and the attorney had discussed the possible advantages of a plea arrangement would have been cumulative.

**Am Jur 2d, Witnesses §§ 350-353.**

**Party's waiver of privilege as to communications with counsel by taking stand and testifying. 51 ALR2d 521.**

**15. Jury § 132 (NCI4th)— first-degree murder—jury selection questions—disposition of codefendant's cases—ability to ignore**

The trial court did not err in a first-degree murder prosecution by overruling defendant's objection to asking a prospective juror "Can you decide this case without comparing it with the dis-

position of the co-defendants' cases, if you're told about that?" The trial court did not abuse its discretion in denying the objection based on the grounds for defendant's objection at trial because defendant was allowed to ask her own questions regarding the disposition of the codefendants' cases. As to the grounds raised for the first time on appeal, the questions sought to identify those jurors who would be unable to decide defendant's case based solely on the evidence produced at trial and did not have the effect of urging the jurors to ignore the State's witnesses' potential interest or bias; defendant raised the agreements of the witnesses with the State during jury selection, during trial, during closing argument, and during sentencing; the trial court instructed the jury with regard to the testimony of the witnesses as well as to the disposition of their cases; and, while the prosecutor did not misstate the law, any such misstatement would have been cured by the trial court's proper instructions to the jury.

**Am Jur 2d, Jury §§ 100-158.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

16. **Criminal Law § 475 (NCI4th)— first-degree murder—argument of counsel—defense contention regarding evidence—disallowed, then allowed—proper instruction**

There was no prejudicial error in a first-degree murder prosecution where defendant contended that the trial court erroneously disallowed the defense argument that a State's witness had talked in jail to a defense witness (who testified that the State's witness had confessed to her) and that the trial court erroneously allowed the prosecutor's argument that the defense witness was not in jail when the conversation allegedly occurred. Defense counsel made the same contention after the objection was sustained without objection and without intervention from the court, and the trial court correctly instructed the jurors to take their own recollection of the evidence.

**Am Jur 2d, Trial §§ 1544 et seq.**

17. **Homicide § 552 (NCI4th)— first-degree murder—second-degree murder as accessory not submitted—no error**

The trial court did not err in a first-degree murder prosecution by not submitting the possible verdict of second-degree mur-

der as an accessory before the fact where there was substantial evidence to prove each element of first-degree murder and evidence of second-degree murder was totally lacking.

**Am Jur 2d, Homicide §§ 223 et seq.**

**18. Homicide § 393 (NCI4th)— first-degree murder—alcohol consumption by accomplice—no evidence of effect of alcohol**

There was no merit in a prosecution for first-degree murder and conspiracy to defendant's argument that an accomplice's alcohol consumption prior to the killing negated premeditation and deliberation. There was no evidence relating to the effect of alcohol on the accomplice at the time of the killing and the accomplice admitted on cross-examination that the murder was premeditated and deliberated.

**Am Jur 2d, Homicide § 448.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Cornelius, J., at the 1 November 1993 Criminal Session of Superior Court, Guilford County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments for conspiracy to commit murder and solicitation to commit murder was allowed 27 January 1995. Heard in the Supreme Court 14 November 1995.

*Michael F. Easley, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Defendant, Donna Sue Westbrooks, was tried capitally for first-degree murder, conspiracy to commit murder, solicitation to commit murder, two counts of forgery of an endorsement, and two counts of uttering an instrument containing a forged endorsement. During the trial the State dismissed the forgery and uttering charges. The jury

found defendant guilty of first-degree murder, conspiracy to commit murder, and solicitation to commit murder. Defendant was sentenced to life imprisonment for the first-degree murder conviction, thirty years' imprisonment for conspiracy to commit murder, and thirty years' imprisonment for solicitation to commit murder, all sentences to be served consecutively.

At trial the State's evidence tended to show that in June 1991 defendant bought a Greensboro bar named the Bench Tavern. Defendant was married to the victim, James Alvin Westbrooks. Defendant purchased the bar by obtaining a home equity loan on the victim's home. At the time defendant purchased the bar, the victim was employed as a salesman for a Greensboro beer distributor. In November 1991 the victim injured his back in a work-related accident and was disabled. The victim remained at home and began receiving workers' compensation benefits.

Zachary Neal Davis, Jr. was in the floor-covering business in Greensboro. Davis became acquainted with defendant and installed a vinyl floor in the Westbrookses' home. When the Bench Tavern was doing poorly in July 1991, Davis loaned defendant $3,000. In September 1991 Davis loaned defendant an additional $3,500. In early 1992 Davis and Betty W. Cashwell purchased a bar in Greensboro named the Winner's Circle.

Defendant approached Davis and told him that she wanted to have her husband killed. She asked if he thought it could be done for $10,000. According to Carita Jones, a bartender at the Bench Tavern, Davis told her that defendant had offered him $10,000 to kill her husband. Sometime after this initial conversation, defendant confronted Davis again and said that she "wanted to do away with Jimmy" because "he had just gotten out of the hospital and his health was bad, and she didn't like seeing him suffer." Davis agreed to arrange the killing for $15,000, which was to come out of the victim's life insurance proceeds.

Davis asked his friend James Copeland if he knew anyone who could carry out the killing, but he did not. Davis then talked to his brother, Johnny Davis. Johnny testified that his brother approached him at the Winner's Circle bar and asked if he "knew anybody that would get rid of another person." Davis then told Johnny defendant was paying $15,000 to get rid of her husband because she wanted to collect his life insurance proceeds. Johnny would have nothing to do with his brother's plan. Finally, Davis

approached his business partner, Betty Cashwell, and elicited her help in the murder.

In January 1992 the victim had back surgery related to his work injury; he was still out of work with his injury in March 1992. Prior to the murder defendant told the victim that Davis was going to come to the house on 13 March 1992 to repair a portion of the flooring Davis had previously installed. Davis and Cashwell drove to the victim's home at approximately 2:00 p.m. on the thirteenth; after the victim let them in, Davis began inspecting the flooring. Cashwell then went into the bedroom and got a knife from a location previously disclosed to her by defendant. Cashwell attacked the victim with a knife, and a struggle ensued. Davis and Cashwell testified that the victim put up a "hell of a fight." Davis testified that Cashwell stabbed the victim repeatedly and that Davis then stabbed the victim "once or twice" more. Cashwell gave a similar account of the murder except that in her testimony Davis did the stabbing. By the end of the struggle, defendant was dead on his carport floor.

After determining that the victim was dead, Davis and Cashwell left the victim's home, threw the knife out the window, changed clothes, washed blood off the front of Cashwell's car, and hid the bloodied clothes. They then removed the license tags from Cashwell's car, threw them in a pond, and went to a bar in the country to abandon the automobile. Davis flattened the right rear tire and then kicked dust on the car to make it look like it had been left for some time. The two then rode back to the Winner's Circle bar in another car.

Dr. Deborah L. Radisch, associate chief medical examiner of the State of North Carolina, performed an autopsy on the victim. According to Dr. Radisch the victim had numerous abrasions and twenty-three stab wounds. The victim bled to death from these wounds.

Defendant testified on her own behalf and contended that she had no part in the murder of her husband. Defendant's testimony tended to show that in December 1991 Davis said he needed money to purchase a bar and demanded several times that the loans be repaid. Davis asked whether defendant could borrow from either her or her husband's insurance policies, and she told him she could not. In January 1992 defendant's financial condition was poor. Defendant testified that she was losing money at the bar, but then "started making a little money," and "it wasn't so bad that [she] couldn't take care of everything." On 13 May 1992, Davis told defendant that Cashwell had

killed the victim and that he had been present. According to defendant Davis indicated that Cashwell killed the victim because she needed money to pay off a debt and she believed there was money at the Westbrookses' home.

Angle Maberson testified that she and Cashwell were in the Guilford County jail together in early September 1993, that Cashwell was upset, and that Cashwell said then that "she was looking at a lot of time" and was going to have to tell a story that was not true because she "had to tell what the DA wanted to hear." Maberson testified that she saw Cashwell again after Cashwell testified in court. Cashwell was hysterical and said, "[I] did it, and [I] know that the lady didn't do it, but [I] had to, because [I] was looking at a lot of time" and "the DA wasn't going to give [me] the kind of plea bargain that [I] wanted."

Defendant also introduced into evidence portions of the victim's medical records from a July 1991 hospitalization for depression. The records disclosed that the victim reported his marriage as good, that he was very close with his wife, that he denied any marital problems, and that he felt his marriage was "very positive."

On rebuttal Sheila Hanes, the records clerk supervisor at the Guilford County jail, testified that Betty Cashwell and Angle Maberson were never housed together or adjacent to one another in such a way that they could carry on a conversation while in the jail.

Zachary Davis and Betty Cashwell pled guilty to conspiracy to commit murder and second-degree murder pursuant to a plea arrangement. Johnny Davis and James Copeland testified under a grant of immunity.

[1] In her first two assignments of error, defendant contends that the trial court used the same item of evidence to prove more than one aggravating factor in both the conspiracy and solicitation cases. In the conspiracy case the court marked box number 14 on the "Felony Judgment Findings of Factors in Aggravation and Mitigation of Punishment" form (herein sentencing form), which provides: "The defendant took advantage of a position of trust or confidence to commit the offense." Box number 16 on the sentencing form represents "[a]dditional written findings of factors in aggravation." The trial court marked this box as well, and the following statement was typewritten:

**STATE v. WESTBROOKS**

[345 N.C. 43 (1996)]

The defendant took advantage of a position of trust in the husband/wife relationship with the information obtained about insurance coverage and where he would be on a certain date when the attack occurred and provided this to the victim's assailant.

Defendant argues that two separate factors in aggravation were found based on the same evidence.

The Fair Sentencing Act prohibits the use of the same item of evidence to prove more than one factor in aggravation. N.C.G.S. § 15A-1340.4(a)(1) (1988)[1]. After a review of the record, we find that the trial court found only one aggravating factor and based its ruling on this single factor. The trial court made the following finding for the conspiracy conviction:

The Court would find as *an aggravating factor* that the defendant took advantage of a position of trust in the husband and wife relationship, and with information obtained about the insurance coverage and where he would be on a certain date that the attack occurred was provided to his assailants.

(Emphasis added.) The trial court then set out the mitigating factors and finally concluded that "the *factor* in aggravation outweighs the mitigating factors, the reason for the deviation from the presumptive." (Emphasis added.) We conclude that the trial judge marked an additional box on the sentencing form in order to explain the single statutory finding. The language inserted on the form in finding number 16 is explanatory of finding number 14 and was not treated as a separate factor in aggravation. The court thus did not find two factors in aggravation based on the same evidence. *See State v. Laney*, 74 N.C. App. 571, 328 S.E.2d 586 (1985).

We are mindful of our recent decision in *State v. Morston*, 336 N.C. 381, 445 S.E.2d 1 (1994), in which we held that a discrepancy between the sentencing form and the transcript entitled defendant to a new sentencing hearing. In *Morston* the sentencing form indicated that the trial court found two aggravating factors: the offense was committed to disrupt the lawful exercise of a governmental function or the enforcement of laws, and the offense was committed to hinder the lawful exercise of a governmental function or the enforcement of

---

1. The Fair Sentencing Act, as contained in N.C.G.S. § 15A-1340.1 through -1340.7, was repealed effective 1 October 1994, when the Structured Sentencing Act became effective for offenses occurring on or after that date. The Fair Sentencing Act applies in this case.

laws. The State contended in *Morston* the sentencing form contained a clerical error and that the transcript revealed that the trial court actually found only one of the aggravating factors. We stated in *Morston* that "the better course is to err on the side of caution and resolve in the defendant's favor the discrepancy between the trial court's statement in open court, as revealed by the transcript, and the sentencing form." *Id.* at 410, 445 S.E.2d at 17.

The instant case is distinguishable from *Morston* in that there is no discrepancy between the sentencing form and the transcript. Rather, the transcript is consistent with the sentencing form and supports the conclusion that the trial judge marked an additional box on the sentencing form in order to explain the single statutory finding. The record shows that defendant was properly sentenced to the maximum penalty on her conspiracy conviction. Thus, this assignment of error as to the conspiracy to commit murder count is overruled. For the reasons discussed hereinafter, we do not address the assignments of error related to application of the Fair Sentencing Act to the solicitation to commit murder count.

[2] Defendant next contends that the conviction for solicitation to commit murder should be vacated because her conviction for solicitation to commit murder and either her first-degree murder conviction as an accessory before the fact or her conspiracy to commit murder conviction constitute unconstitutional multiple punishment for the same offense. Defendant asserts that her double jeopardy rights were violated because she was punished for both a lesser included offense as well as the greater offense.

The issue of whether solicitation to commit murder is a lesser included offense of murder as an accessory before the fact is one of first impression in this state. The determination of whether one offense is a lesser included offense of another is made on a definitional as opposed to a factual basis. *State v. Weaver*, 306 N.C. 629, 635, 295 S.E.2d 375, 378 (1982), *overruled on other grounds by State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 (1993). "[A]ll of the essential elements of the lesser crime must also be essential elements included in the greater crime. If the lesser crime has an essential element which is not completely covered by the greater crime, it is not a lesser included offense." *Id.* at 635, 295 S.E.2d at 379. We agree with defendant's contention that solicitation to commit murder is a lesser included offense of murder as an accessory before the fact.

STATE v. WESTBROOKS

[345 N.C. 43 (1996)]

The essential elements of accessory before the fact to murder are (i) the defendant must have counseled, procured, commanded, encouraged, or aided the principal in the commission of the murder; (ii) the principal must have committed the murder; and (iii) the defendant must not have been present when the murder was committed. *State v. Davis*, 319 N.C. 620, 356 S.E.2d 340 (1987). The gravamen of the crime of solicitation is counseling, enticing, or inducing another to commit a crime. *State v. Furr*, 292 N.C. 711, 235 S.E.2d 193, *cert. denied*, 434 U.S. 924, 54 L. Ed. 2d 281 (1977). From these definitions it appears that the crime of solicitation to commit murder contains no element that is not also present in the offense of being an accessory before the fact to murder. Thus, evidence that defendant was an accessory before the fact to murder would support a conviction of solicitation to commit murder. Applying the "definitional" approach to these two crimes leads to the result that solicitation to commit murder merges into the offense of being an accessory before the fact to the same murder. This same result was reached by Maryland's highest court in *Lewis v. State*, 285 Md. 705, 404 A.2d 1073 (1979); *see also* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 649-50 (3d ed. 1982) ("If the [solicitee] commits the crime the [solicitor] is also guilty of that crime although at common law his guilt would be as an accessory before the fact if [the crime] was a felony and he was not present at the time. The solicitation is so far merged in the resulting offense that the solicitor cannot be punished for both.") (footnotes omitted); 4 Charles E. Torcia, *Wharton's Criminal Law* § 719, at 521 (14th ed. 1981) ("[A] person may not be convicted, 'on the basis of the same course of conduct', of both solicitation and the offense solicited.") (footnote omitted).

Under the factual approach there is a possibility that under a particular set of facts, a defendant may have solicited someone to commit a crime without being an accessory before the fact to that crime or that a defendant was an accessory before the fact to the crime but did not solicit the crime. Our case law is clear, however, that we use a "definitional" approach when making such an inquiry. "We do not agree with the proposition that the *facts* of a particular case should determine whether one crime is a lesser included offense of another. Rather, the *definitions* accorded the crimes determine whether one offense is a lesser included offense of another crime." *Weaver*, 306 N.C. at 635, 295 S.E.2d at 378. Defendant's conviction for solicitation to commit murder must be vacated.

Defendant also contends that solicitation to commit murder is a lesser included offense of conspiracy to commit murder. Having

determined that solicitation to commit murder is a lesser included offense of murder as an accessory before the fact and that the solicitation conviction must be vacated, we are not required to reach this issue.

In defendant's next assignments of error, she asks this Court to reconsider its previous holdings that conspiracy to commit murder is not a lesser included offense of first-degree murder as an accessory before the fact. *See, e.g., State v. Looney,* 294 N.C. 1, 240 S.E.2d 612 (1978). Defendant offers no argument meriting reconsideration of our position on this issue. Thus, these assignments of error are overruled.

**[3]** Defendant next contends that her murder conviction must be vacated because there is insufficient evidence that she committed the offense as charged in the indictment. Indictment number 92CRS43698 charged that defendant "unlawfully, willfully and feloniously did *acting in concert* with Betty Cashwell and Zachary Davis, . . . of malice aforethought kill and murder James Alvin Westbrooks." (Emphasis added.) Defendant contends that because there was no evidence that she was present at the scene of the murder, a required element of acting in concert, she cannot be found guilty of murder under this indictment. Defendant's argument is that because the indictment stated acting in concert as the specific theory of murder, the allegations against defendant were limited to that theory, and her conviction for first-degree murder on an accessory-before-the-fact theory must be vacated. We do not agree.

A criminal indictment is sufficient if it expresses "the charge against the defendant in a plain, intelligible, and explicit manner." N.C.G.S. § 15-153 (1983). Specifically, the indictment must allege all of the essential elements of the crime sought to be charged. *State v. Courtney,* 248 N.C. 447, 103 S.E.2d 861 (1958). "Allegations beyond the essential elements of the crime sought to be charged are irrelevant and may be treated as surplusage." *State v. Taylor,* 280 N.C. 273, 276, 185 S.E.2d 677, 680 (1972). Acting in concert is not an essential element of first-degree murder, and the prosecution was not required to prove this fact in order to prove that defendant was guilty of first-degree murder. Thus, the allegation of the indictment that defendant acted in concert with Zachary Davis and Betty Cashwell is an allegation beyond the essential elements of the crime charged and is, therefore, surplusage. *See State v. Freeman,* 314 N.C. 432, 333 S.E.2d 743 (1985).

The purposes of an indictment include giving a defendant notice of the charge against him so that he may prepare his defense and be in a position to plead double jeopardy if he is again brought to trial for the same offense. *Id.* In the instant case defendant had notice of the first-degree murder charge against her and presented her defense accordingly. Defendant testified in her own defense that she did not hire Davis or Cashwell or anyone else to murder her husband. Defendant was found guilty of first-degree murder on an accessory-before-the-fact theory. The indictment and the evidence supported this verdict. This assignment of error is overruled.

**[4]** By her next two assignments of error, defendant argues that testimony by two witnesses repeating statements made to them by the victim before his death was inadmissible and irrelevant hearsay. Defendant contends that the trial court erred by admitting testimony of statements made by the victim.

James Alvin Westbrooks, Sr., the victim's father, testified that he and the victim talked about the victim's financial and marital problems on 12 March 1992. Mr. Westbrooks testified that during this conversation, he told the victim he would hire an attorney to handle his financial and marital problems; in response the victim stated, "All she's done to me, I still don't want to hurt her."

Deborah Westbrooks Blair, the victim's sister, testified that the victim told her that he was upset about his finances, "that he was in terrible financial shape, that he was really concerned about it. He was very depressed. He was very lonely." She testified that the victim told her he had been getting calls and bills from creditors which he knew nothing about and that defendant was responsible.

The trial court found that these statements were admissible under Rule 803(3) of the North Carolina Rules of Evidence. Rule 803(3) provides that "[a] statement of the declarant's then existing state of mind" is not excluded by the hearsay rule. N.C.G.S. § 8C-1, Rule 803(3) (1992). Defendant argues that our recent decision in *State v. Hardy*, 339 N.C. 207, 451 S.E.2d 600 (1994), precludes the admission of these statements for two reasons. First, defendant contends that these statements were of "facts" rather than state of mind. Second, defendant contends that the victim's state of mind is not relevant under the *Hardy* standard.

The victim's statements to his sister that he was depressed, lonely, and upset about his finances were statements indicating his

mental condition at the time they were made and were not merely a recitation of facts. Similarly, the victim's statements to his father about his feelings towards his marriage to the defendant expressed the victim's state of mind. *See State v. Lambert*, 341 N.C. 36, 460 S.E.2d 123 (1995) (victim's statements that his marriage "wasn't getting along like it should" and that he was leaving were statements of victim's then-existing state of mind).

"Evidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand." *State v. Stager*, 329 N.C. 278, 314, 406 S.E.2d 876, 897 (1991). In the instant case evidence of the victim's state of mind is relevant in that it bears directly on the victim's relationship with the defendant at the time he was killed. *See id.*; *State v. McLemore*, 343 N.C. 240, 470 S.E.2d 2 (1996). Defendant contends *Hardy* holds that hearsay evidence showing a victim's state of mind is not admissible unless the State demonstrates with particularity why that state of mind is relevant "beyond the nature of the relationship." In *Hardy* the State introduced portions of the victim's diary to show that the victim feared the defendant, her husband. However, there were many inconsistencies in the material in the diary, and some of the diary entries suggested that the victim was not afraid of her husband. In *Hardy* we found that the State failed to "clarify" what the nature of the relation was between the victim and the defendant. *Hardy*, 339 N.C. at 230, 451 S.E.2d at 613. The inconsistencies present in the hearsay evidence in *Hardy* are not present in this case. The statements made to Mr. Westbrooks and Ms. Blair reflect a man concerned about his marriage and his wife's handling of their finances. These statements also corroborate a motive for the murder—that defendant was in debt and could not repay her obligations. *See Stager*, 329 N.C. at 315, 406 S.E.2d at 897. Thus, these statements are admissible as statements of the declarant's then-existing state of mind.

[5] The victim's statements about the telephone calls and bills from creditors he knew nothing about and defendant's role in his financial situation are also admissible. In *Stager*, 329 N.C. 278, 406 S.E.2d 876, we held admissible an audiotape made by the victim before he was murdered by his wife. On the tape the victim described his financial troubles, which were caused by his wife. For example, the victim stated on the tape that he had to get a post office box after bills started disappearing, that the police had come to the house to serve warrants on his wife for her unpaid bills, that his wife spent the money he gave her to make the car payments, and that without his

knowledge she borrowed money that they could not repay. We held the tape in *Stager* admissible under the state of mind exception to the hearsay rule because the statement "[bore] directly on [the victim's] relationship with the defendant at about the time she was alleged to have killed him." *Id.* at 314, 406 S.E.2d at 897. Likewise, in the instant case the victim's statements bear directly on the victim's relationship with defendant at the time the victim was killed. Defendant again argues that these statements are recitations of facts rather than state of mind. However, under the facts of this case, we find that these statements were made contemporaneously with and in explanation of the victim's statements that he was concerned and upset about his finances. Thus, these statements are admissible as statements of the declarant's then-existing state of mind.

**[6]** In addition, statements concerning the status of the marriage between the victim and defendant were admissible to contradict defendant's contention at trial that she and the victim had no marital problems. Defendant's testimony about the positive state of her marriage opened the door to rebuttal evidence. *See Lambert*, 341 N.C. at 49, 460 S.E.2d at 131. " 'Discrediting a witness by proving, through other evidence, that the facts were otherwise than [s]he testified, is an obvious and customary process that needs little comment. If the challenged fact is material, the contradicting evidence is just as much substantive evidence as the testimony under attack, and no special rules are required.' " *Id.* (quoting 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 160 (4th ed. 1993)). The evidence of the victim's statements was relevant to refute the assertion by defendant that there were no marital problems. *See id.*; *Stager*, 329 N.C. at 314, 406 S.E.2d at 897.

Regardless of whether it was error to admit the statements challenged by defendant, defendant has not shown that she was prejudiced by their admission. The failure of a trial court to exclude evidence tending to show a declarant's state of mind "will not result in the granting of a new trial absent a showing by defendant that a reasonable possibility exists that a different result would have been reached absent the error." *State v. Weeks*, 322 N.C. 152, 170, 367 S.E.2d 895, 906 (1988). Several witnesses testified about the Westbrookses' financial problems. Lisa Webster, a credit bureau research specialist, testified to defendant's uncollectible debt. Diane Bush, a bartender at the Bench Tavern, testified that defendant could not meet her bills at the bar. Karen Furr, another bartender at the Bench Tavern, testified that "[she] never knew when [she] was getting

paid" and that she "always had excuses from Donna, about her accountant being out of town or on vacation." Karen Furr also testified that she "always heard Donna complaining that she didn't have any money." Both Diane Bush and Karen Furr testified that beer distributors would not accept defendant's checks and that beer deliveries had to be paid for in cash.

Defendant herself testified that in early 1992, the state of her personal finances was "poor." Defendant further testified that she had lost money at the bar and that she had "talked to some of [her] creditors[] and . . . had made arrangements" with some retail creditors about her debts. Thus, any statements admitted about the Westbrookses' poor financial condition were not prejudicial.

Similarly, witnesses testified about personal problems between defendant and the victim. Diane Bush testified that defendant made comments "a time or two" that she hated her husband. In addition, Karen Furr testified that defendant "complain[ed] about having to go home to [her husband]." Thus, any statements admitted about the status of the Westbrookses' marriage were not prejudicial. For all of the above reasons, these assignments of error are overruled.

[7] By further assignments of error, defendant contends that the trial court erred by admitting testimony from James Alvin Westbrooks, Sr. and Deborah Westbrooks Blair about statements they made to the victim prior to the murder. Mr. Westbrooks testified that he told the victim not to marry defendant because she could not handle finances and money and not to buy a life insurance policy. Mr. Westbrooks also testified that he told the victim he would hire an attorney to handle the victim's financial and marital problems; that he would give the victim money to help him with his financial problems, but that he would not give him money for defendant to spend; and that he told the victim's bank to freeze the victim's assets after he died and told the insurance company to reissue checks to the victim's estate.

Deborah Blair testified that she told the victim he "needed to try and do something about [defendant] coming home drunk every night" and that the victim would never be happy until he got an attorney and a divorce.

Assuming *arguendo* that admission of this testimony was error, we do not find this error to be prejudicial. Given the overwhelming evidence against defendant in this case, there is no reasonable possibility that, had this evidence not been admitted, a different result

would have been reached. N.C.G.S. § 15A-1443(a) (1988). These assignments of error are overruled.

[8] Defendant's next assignments of error concern the admission of evidence about statements she made to Detective David DeBerry before and after her arrest. Defendant contends that the admission of testimony by DeBerry regarding those statements and the prosecutor's subsequent cross-examination and argument about those statements violated her right to silence under the Fifth Amendment to the Constitution of the United States and Article I, Section 23 of the Constitution of North Carolina. Defendant argues that her rights were violated by the use of her pre- and postarrest silence for both impeachment and substantive purposes.

At trial DeBerry read to the jury defendant's post-*Miranda* statement made on 16 May 1992. In the 16 May statement defendant recalled a conversation with Davis which took place "[a]round the first of the year" in which defendant was telling Davis about problems at home and that the victim was not pleased with anything she did. Defendant stated that during this conversation, she made the comment that she "wished [the victim] was dead." The statement also referred to a conversation defendant had with Davis "[a]pproximately a month later" in which she told Davis that the victim had a $50,000 life insurance policy with her as the beneficiary. The statement also contained a recollection by defendant that Davis was tentatively scheduled to fix the vinyl flooring in her house about the time the victim died and that "[a] couple of times since Jimmy's death," Davis had asked her about the $6,500 and about the money from the insurance company.

Immediately after DeBerry read the statement, the prosecutor asked DeBerry a series of questions about whether defendant ever told him before her arrest about the facts she told him on 16 May. DeBerry testified that defendant had not previously revealed these facts to him. The 16 May statement did not make mention of any conversation between defendant and Davis on 13 May 1992.

Defendant testified on her own behalf and recounted a conversation she had with Davis on 13 May 1992. According to defendant, on 13 May Davis told defendant that Cashwell killed the victim. This information was not contained in the 16 May statement. On cross-examination the prosecutor questioned defendant about why she did not tell DeBerry, either before or after her 16 May arrest, about the 13 May conversation with Davis and why she did not tell DeBerry

about facts she first revealed in her 16 May statement. Defendant asserted that she never gave this information to DeBerry because she did not have her lawyer present and because DeBerry by his continuous questioning never gave her a chance to give him this information. On rebuttal for the State, DeBerry confirmed that defendant did not tell him about Davis' conversation with her on 13 May. In closing argument the prosecutor stated:

> And then she went on to tell you five separate times that she met with Detective DeBerry, that she never once told him who the killer of her husband was. Is that the act of a grieving widow? Or is that the act of a co-conspirator?

We first address defendant's contention that her rights were violated by the use of her prearrest silence for impeachment purposes. A criminal defendant's exercise of his right to remain silent cannot be used against him to impeach an explanation subsequently offered at trial. *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91 (1976). Although the rule set forth in *Doyle* is well established, certain limitations to *Doyle* have developed in the case law of the United States Supreme Court and have been applied by this Court.

In *Jenkins v. Anderson*, 447 U.S. 231, 65 L. Ed. 2d 86 (1980), the Supreme Court held that use of a defendant's prearrest silence to impeach his credibility on cross-examination does not violate the Fifth or Fourteenth Amendment. The *Jenkins* Court held that a prosecutor could cross-examine the defendant about his failure prior to his arrest to tell anyone he was acting in self-defense on the night of the murder and that the prosecutor could mention this failure in his closing argument. The Court emphasized the fact that "no governmental action induced petitioner to remain silent before arrest." *Id.* at 240, 65 L. Ed. 2d at 96.

Similarly, in the instant case defendant was not induced to remain silent before her arrest, and use of her prearrest silence does not violate defendant's Fifth Amendment rights. The record reveals that defendant never invoked or relied upon her right to remain silent. On the contrary defendant frequently talked with the investigators in her husband's case. Defendant testified at trial that she talked with members of the Sheriff's Department about the circumstances surrounding her husband's death every day up until the time she was arrested.

[9] However, the fact that the Fifth Amendment is not violated by the use of prearrest silence to impeach a defendant's credibility does not

mean that admission of this testimony was proper under our common law rules. In *Jenkins* the Court noted that

> [c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative.

*Id.* at 239, 65 L. Ed. 2d at 95 (citation omitted). To analyze defendant's contention that her constitutional rights were violated by the use of any prearrest silence, pursuant to the rules of evidence formulated by our jurisdiction, we look to our opinion in *State v. Lane*, 301 N.C. 382, 271 S.E.2d 273 (1980).

In *Lane* this Court addressed the issue of allowing the prosecutor to use evidence of defendant's pre-*Miranda* silence to impeach the defendant during cross-examination. The defendant stated prior to receiving any *Miranda* warnings, "Hell, I sold heroin before, but I didn't sell heroin to this person." *Id.* at 382, 271 S.E.2d at 274. The defendant testified at trial that he had an alibi for the crime for which he was being tried. On cross-examination the prosecutor asked defendant why he had not told the police about this alibi prior to trial. In determining whether the cross-examination was permissible, we noted:

> "Prior statements of a witness which are inconsistent with his present testimony are not admissible as substantive evidence because of their hearsay nature. Even so, such prior inconsistent statements are admissible for the purpose of impeachment. . . .
>
> " '. . . [I]f the former statement fails to mention a material circumstance presently testified to, *which it would have been natural to mention in the prior statement,* the prior statement is sufficiently inconsistent,' . . . . [Citations omitted.] [Emphasis added.]"

*Id.* at 386, 271 S.E.2d at 276 (quoting *State v. Mack*, 282 N.C. 334, 339-40, 193 S.E.2d 71, 75 (1972)) (citations omitted) (alterations in original). We held in *Lane* that "[t]he crux of this case is whether it would have been natural for defendant to have mentioned his alibi defense at the time he voluntarily stated [to the police] that he 'did not sell heroin to this person.' " *Id.*

Under the *Lane* analysis the question now before this Court is whether defendant's failure to mention her conversation with Davis on 13 May 1992 during her daily conversations with police officers amounts to an inconsistent statement. We must likewise determine whether defendant's failure to mention facts set out in her 16 May statement during prior discussions with police officers amounts to an inconsistent statement.

We conclude that it would have been natural for defendant to have told officers about the conversation with Davis on 13 May 1992 in light of the fact that during this conversation, Davis told her who killed her husband. We conclude defendant's silence about this conversation was evidence of an inconsistent statement in this particular case and that it was not error for the court to allow the prosecutor's cross-examination of defendant on this issue.

Assuming *arguendo* that it would not have been natural for defendant to have told officers about the facts set out in her 16 May statement—information about defendant's statement that she "wished [the victim] was dead," information about defendant's conversations with Davis about insurance and money, and information that Davis was tentatively scheduled to fix the vinyl flooring about the time the victim died—we conclude that given the overwhelming evidence against defendant, any error was not prejudicial.

[10] To analyze defendant's contention that her constitutional rights were violated by use of her postarrest, post-*Miranda* silence for impeachment, we turn to the United States Supreme Court decision in *Anderson v. Charles*, 447 U.S. 404, 65 L. Ed. 2d 222 (1980) (per curiam). In *Anderson* the Supreme Court declined to apply *Doyle* to a prosecutor's cross-examination that inquired into prior inconsistent statements of the defendant. The Court stated:

> Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Id.* at 408, 65 L. Ed. 2d at 226. We applied the limitation established by *Anderson* in *State v. Mitchell*, 317 N.C. 661, 346 S.E.2d 458 (1986). In *Mitchell* the defendant was charged with rape, armed robbery, kidnapping, and larceny. The investigating officer testified that he escorted the defendant back to North Carolina from Tennessee. Prior to the start of the car ride, the officer gave the defendant his *Miranda* warnings. The officer testified that during the trip, the defendant

informed the officer that the victim's car had been stolen from him when he stopped at a truck stop. At trial the defendant testified that he had entered into a plan with the victim to burn her car so that she could collect insurance proceeds and that they had engaged in consensual sexual intercourse. The prosecutor asked defendant on cross-examination why he did not originally tell the investigating officer about the planned insurance fraud. The defendant contended on appeal that the prosecutor impermissibly used his silence for impeachment purposes in violation of *Doyle*.

This Court, in determining that this cross-examination was permissible in *Mitchell*, held that the rule set forth in *Doyle* was inapplicable to the facts:

> Here, the defendant did not exercise his right to remain silent after receiving *Miranda* warnings. He voluntarily engaged in conversation with [the police officer] and said that after he had taken the victim's car it had been stolen from him. The prosecutor did not attempt to capitalize on the defendant's reliance on the implicit assurances of the *Miranda* warnings, the concern embodied in the *Doyle* decision.

*Id.* at 667, 346 S.E.2d at 461-62.

The record in this case discloses that defendant was similarly not induced to remain silent. Upon her arrest on 16 May 1992 and after receiving the required *Miranda* warnings, defendant executed a waiver and voluntarily gave a statement to the investigating officers regarding the charges against her. "As to the subject matter of [her] statements, the defendant did not remain silent at all." *Id.* at 667, 346 S.E.2d at 462. Therefore, any references to omissions or inconsistencies in statements defendant made after receiving her *Miranda* warnings, were proper.

**[11]** Defendant also contends that her rights were violated by the use of her pre- and postarrest silence for substantive purposes based on the testimony of DeBerry in the case-in-chief and on rebuttal. Assuming *arguendo* that it was error to allow DeBerry to testify as to what defendant failed to tell him, given the overwhelming evidence against defendant, we conclude that this error was harmless beyond a reasonable doubt.

**[12]** Finally, defendant contends that the prosecutor's closing argument was improper because the argument "plainly urged the jury to draw meaning from [defendant's] post and pre-arrest silence" as to

the 13 May conversation with Davis. First, we note that defendant did not object to this portion of the closing argument. Where there is no objection, "the standard of review to determine whether the trial court should have intervened *ex mero motu* is whether the allegedly improper argument was so prejudicial and grossly improper as to interfere with defendant's right to a fair trial." *State v. Alford*, 339 N.C. 562, 571, 453 S.E.2d 512, 516 (1995). We conclude that in this case, the prosecutor's closing argument on defendant's failure to tell the police the identity of her husband's murderer was made to impeach defendant's trial testimony. The prosecutor raised the question during closing argument that if in fact Davis had told defendant on 13 May 1992 that Cashwell killed the victim, why did defendant not reveal this information to the police prior to her trial. Based on defendant's trial testimony, the natural tendency would be for defendant to have mentioned the 13 May conversation prior to taking the stand; thus, it was proper to raise this question in order to impeach defendant's testimony at trial. *See State v. Buckner*, 342 N.C. 198, 464 S.E.2d 414 (1995), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 65 U.S.L.W. 3258 (1996). These assignments of error are overruled.

**[13]** By her next assignment of error, defendant contends that the trial court erred by limiting her right to confront, cross-examine, and impeach State's witnesses Zachary Davis and Betty Cashwell thereby precluding her from inquiring about their parole eligibility under their guilty pleas.

Section 15A-1055 of the North Carolina General Statutes provides that "[n]otwithstanding any other rule of evidence to the contrary, any party may examine a witness testifying . . . pursuant to [a plea arrangement] with respect to that . . . arrangement." N.C.G.S. § 15A-1055 (1988). Our case law also holds that "cross-examination is a proper method of testing a witness as to bias concerning . . . his just expectation of reward, pardon, or parole as the result of his testifying for the State." *State v. Wilson*, 322 N.C. 117, 135, 367 S.E.2d 589, 600 (1988).

However, we have also held that where a question concerning plea arrangements calls for legal knowledge on the part of a lay witness, the State's objection is properly sustained. *Id.*; *accord State v. Mason*, 295 N.C. 584, 248 S.E.2d 241 (1978) (holding that it is within the discretion of the trial judge to sustain the State's objection where questions to a witness go to his understanding of the law concerning parole and call for the legal knowledge of a lay witness), *cert. denied*, 440 U.S. 984, 60 L. Ed. 2d 246 (1979).

In *Wilson* defense counsel attempted to question the witness about his understanding of the laws concerning sentencing and parole eligibility. We held that "[i]t was not an abuse of discretion to prohibit the witness from answering since the witness had already stated that he was motivated to testify for the State because of a plea bargain arrangement." 322 N.C. at 135-36, 367 S.E.2d at 600.

In the instant case both witnesses testified that they were motivated to testify for the State because of a plea arrangement. This type of testimony is "more probative of bias than the legal distinction asked of [them] by the defense." *Wilson*, 322 N.C. at 136, 367 S.E.2d at 600. The fact that these witnesses had made arrangements for charge reductions in exchange for their testimony was clearly before the jury, and defendant has demonstrated no abuse of the trial court's discretion. This assignment of error is overruled.

[14] By her next assignment of error, defendant contends that the trial court erroneously allowed the attorney for Betty Cashwell to invoke the attorney-client privilege during an offer of proof concerning parole eligibility information. Defendant contends that Betty Cashwell's previous testimony about parole eligibility constituted a waiver of the privilege with regard to the details of her discussions with her attorney.

Assuming *arguendo* that Betty Cashwell waived this privilege, defendant cannot show prejudicial error by this ruling. Betty Cashwell had already testified during cross-examination that the State permitted her to plead guilty to conspiracy to commit murder and second-degree murder in exchange for her testimony. Betty Cashwell read to the jury terms of her plea arrangement, which stated that if she fulfilled the terms and conditions of the agreement, the State agreed not to convict her of first-degree murder and not to seek the death penalty against her. Given Betty Cashwell's testimony as to her plea arrangement, any testimony by the attorney to the effect that Betty Cashwell and she had discussed the possible advantages of a plea arrangement would have been cumulative evidence. *See Morston*, 336 N.C. 381, 445 S.E.2d 1. Any error in allowing the attorney to invoke the attorney-client privilege was not prejudicial. This assignment of error is overruled.

[15] By her next assignments of error, defendant contends that the trial court erred by overruling her objection to a question of prospective jurors. Defendant objected to the following question of a

prospective juror: "Can you decide this case without comparing it with the disposition of the co-defendants' cases, if you're told about that?" Defendant contends that this questioning was improper because it misstated the law and staked out jurors to disregard the codefendants' interest in this case.

It is well established that "while counsel may diligently inquire into a juror's fitness to serve, the extent and manner of that inquiry rests within the trial court's discretion." *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989). To show reversible error on the basis of improper jury *voir dire*, defendant must demonstrate prejudice as well as a clear abuse of discretion. *Id.*

In the case before us, defendant has shown neither prejudice nor abuse of discretion. Defendant objected to one question of a prospective juror: "Can you decide this case without comparing it with the disposition of the co-defendants' cases, if you're told about that?" Defendant's basis for her objection was that the disposition of the codefendants' cases might be the subject of a mitigating circumstance during the sentencing proceeding and that if it was so submitted to the jurors, then it would be their duty to consider the outcome of the codefendants' cases. The trial court then told defense counsel that "they would be allowed to ask questions in that vein, if they wished to do so." Defendant thereafter posed no further objections to the same question of other jurors and posed her own questions to the jury regarding the disposition of the codefendants' cases.

Based on the grounds for defendant's objection at trial, the trial court did not abuse its discretion in denying this objection. Defendant contends for the first time on appeal that the question to the jurors "misstated the law and improperly staked jurors out to disregard a vital factor going to the co-defendants' credibility." We do not agree. The prosecutor's questions did not have the effect of urging the jurors to ignore Davis' and Cashwell's potential interest or bias; rather, the questions sought to identify those jurors who would be unable to decide defendant's case based solely on the evidence produced at trial. The trial judge did not abuse his discretion by allowing such questions.

Nor can defendant show any prejudice by the trial court's actions. Defendant raised the agreements of Davis and Cashwell with the State during jury selection, during trial, during closing argument, and in the submission of mitigating circumstances during sentencing. In addition, the trial court instructed the jury with regard to the testi-

mony of Davis and Cashwell as well as to the disposition of their cases.

Finally, we do not find that the prosecutor misstated any law. However, had there been a misstatement of the law by the prosecutor, any such misstatement would have been cured by the trial court's proper instructions to the jury. *State v. Buckner*, 342 N.C. 198, 464 S.E.2d 414. These assignments of error are overruled.

**[16]** By her next assignments of error, defendant contends that the trial court's rulings during closing arguments resulted in prejudicial error. The jury argument under review centers around the testimony of defense witness Angie Maberson, who claimed to have conversed with Betty Cashwell in the jail before and after Cashwell pled guilty. Defendant contends that the trial court erroneously disallowed her argument that Maberson and Cashwell talked and "[g]ot together" in the county jail. When defense counsel contended in his closing argument that "people talk, people get together," the prosecutor objected on the ground that "[t]he evidence was they were separated." The trial court sustained this objection. Defendant also contends the trial court "erroneously allowed the prosecutor's closing argument that Maberson was not in the jail on September 7, 1993, that Cashwell entered her guilty plea on September 9, and that Maberson testified that she and Cashwell were together on September 9.

"Trial counsel are granted wide latitude in the scope of jury argument, and control of closing arguments is in the discretion of the trial court." *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). Assuming *arguendo* that it was error to sustain the prosecutor's objection to defense counsel's contention during closing arguments that "people talk, people get together," we do not find that any such error was prejudicial. After the objection was sustained, defense counsel made the very same contention that Maberson and Cashwell had talked in the jail; and the contention was made without objection and without any intervention from the court.

Similarly, we do not find that the court's handling of the prosecutor's closing argument was prejudicial. "[F]or an inappropriate prosecutorial comment to justify a new trial, it 'must be sufficiently grave that it is prejudicial error.' " *Id.* at 60, 418 S.E.2d at 487-88 (quoting *State v. Britt*, 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977)). The prosecutor stated in closing that the evidence showed that Maberson was not in the jail on the date she claimed to have talked with Cashwell. Upon defendant's objection to this statement, the trial court

instructed the jurors to "[t]ake [their] own recollection of the evidence." The trial court correctly instructed the jurors to be guided by the evidence based on their own recollections. Defendant was not prejudiced by the trial court's actions during closing arguments. These assignments of error are overruled.

**[17]** By her next assignment of error, defendant contends that the trial court erroneously refused to submit the possible verdict of second-degree murder as an accessory before the fact to the jury. The governing principle is that

> [i]f the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *modified in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986).

This Court addressed the trial court's failure to submit second-degree murder as a possible verdict under similar facts in *State v. Larrimore*, 340 N.C. 119, 456 S.E.2d 789 (1995). In *Larrimore* the evidence showed the defendant hired Daniel McMillian to kill the victim. McMillian pled guilty to second-degree murder and conspiracy to commit murder and testified against the defendant. In contrast, the defendant denied any involvement in the crime, denied knowing McMillian, and contended that the victim's estranged wife arranged for the murder of her husband. The Court in *Larrimore* held that "[i]f the jury believed the State's evidence, it had to find the defendant guilty of first-degree murder. If it believed the defendant's evidence, it would have had to find him not guilty. It thus would have been error to have submitted second-degree murder." *Id.* at 157-58, 456 S.E.2d at 809-10.

In the present case there was substantial evidence to prove each element of first-degree murder. The State's evidence tended to show that defendant hired Zachary Davis to kill her husband for $15,000 to be paid from the proceeds of a life insurance policy. Davis and Cashwell drove to the victim's home, where defendant had placed a

box of knives in a prearranged place, specifically to kill the victim; they accomplished the murder by stabbing the victim twenty-three times. If the jury believed the State's evidence, it had to find defendant guilty of first-degree murder. In addition, we find evidence of second-degree murder totally lacking. The defendant's defense and her evidence, if believed, tended to show that Zachary Davis and Betty Cashwell stabbed and killed the victim and that the defendant had absolutely no role in the killing. If the jury believed the defendant's evidence, it would have to find her not guilty. Thus, to have submitted second-degree murder would have been error.

[18] We also find no merit to defendant's argument that Davis' alcohol consumption prior to the killing negated premeditation and deliberation. There is no evidence in the record relating to the effect of alcohol on Davis at the time of the killing. Further, Davis admitted on cross-examination that the murder was premeditated and deliberated. This assignment of error is overruled.

Finally, defendant requests that this Court examine sealed mental health records of Zachary Davis and Betty Cashwell and determine if they contain any relevant and impeaching evidence against them which was not contained in the materials disclosed by the trial court after an *in camera* review of these records. After examining the medical records on appeal, we conclude that the records do not contain any relevant evidence as to the State's witnesses. These assignments of error are overruled.

NO. 92CRS43698, FIRST-DEGREE MURDER: NO ERROR.

NO. 92CRS20473, COUNT 1, CONSPIRACY TO COMMIT MURDER: NO ERROR.

NO. 92CRS20473, COUNT 2, SOLICITATION TO COMMIT MURDER: JUDGMENT ARRESTED.