STATE OF NORTH CAROLINA v. MAMIE DELOIS JEAN BISHOP

No. 32A93

(Filed 24 July 1997)

**1. Evidence and Witnesses § 876 (NCI4th)— statements by murder victim—state of mind exception to hearsay rule**

Statements by a murder victim to a banker and to her brother expressing her concern about defendant's handling of her real estate transactions and her intent to document defendant's debt to her, to seek repayment, and to confront defendant about her concern that defendant had stolen from her were properly admitted into evidence pursuant to the state of mind exception to the hearsay rule because those statements bore directly on the relationship between the victim and defendant at the time of the killing and were relevant to show a motive for the killing. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Evidence §§ 658-707.**

**Admissibility of statement under Rule 801(d)(2)(B) of Federal Rules of Evidence, providing that statement is not hearsay if party-opponent has manifested his adoption or belief in its truth. 48 ALR Fed. 721.**

**2. Evidence and Witnesses § 876 (NCI4th)— statements by victim—improper admission under state of mind exception—absence of prejudice**

Assuming arguendo that a murder victim's statement to her brother indicating that she had not been paid for horses that defendant had sold for her and her statement to her mother indicating that she had sent money to defendant to lift restrictions on property which defendant was selling for her were improperly admitted under the state of mind exception to the hearsay rule, defendant was not prejudiced by the admission of this testimony in light of other evidence that defendant's motive for the murder was the victim's insistence that defendant pay money defendant owed her, the accomplice's testimony that defendant planned, directed, and participated in the murder of the victim, and evidence that after the murder defendant took the lead in creating and refining an alibi for the accomplice and herself.

**Am Jur 2d, Evidence §§ 679-703.**

STATE v. BISHOP

[346 N.C. 365 (1997)]

**Admissibility of statement under Rule 801(d)(2)(B) of
Federal Rules of Evidence, providing that statement is not
hearsay if party-opponent has manifested his adoption or
belief in its truth. 48 ALR Fed. 721.**

3. **Evidence and Witnesses § 881 (NCI4th)— promissory
note—not hearsay—relevancy to show motive**

A $40,750 promissory note signed by defendant and made
payable to a murder victim was not admitted solely to show the
truth of the matter asserted but was admitted to show that the
victim sought repayment for money defendant owed her and was
thus relevant to establish a motive for the killing.

**Am Jur 2d, Evidence §§ 301-323.**

4. **Evidence and Witnesses § 881 (NCI4th)— financial trans-
actions—writings in victim's possession—admissibility to
show motive**

A murder victim's check register books showing checks and
wire transfers to defendant, a list made by the victim document-
ing checks, money orders, and wire transfers to defendant, hand-
written calculations corresponding to amounts the victim
believed defendant owed her, a spiral notebook containing vari-
ous notes, and a writing by the victim placing a $40,753 value on
cash advances and on land and horses sold by defendant were
admissible for the non-hearsay purpose of showing that the vic-
tim had followed through on her stated intention to document
defendant's debt to her and to establish a motive for the killing.
Even if some or all of the victim's writings were inadmissible
hearsay, defendant was not prejudiced by any error in admitting
them in light of the overwhelming evidence that defendant
planned, directed, and participated in the victim's killing.

**Am Jur 2d, Evidence § 359.**

5. **Evidence and Witnesses § 179 (NCI4th)— cash advances—
real estate dealings—defendant's tax returns—admissibil-
ity to show motive**

Evidence of a murder victim's cash advances to defendant
and the victim's real estate dealings with defendant shed light on
their relationship at the time of the victim's death and, in con-
junction with the victim's statements suggesting that the victim
intended to confront defendant about defendant's debt to her and

defendant's statement to her boyfriend that the victim actually confronted defendant, was relevant to show that defendant had a motive to kill the victim. Furthermore, evidence of defendant's tax returns tending to show that defendant did not earn enough money to lend the victim $30,000 was relevant to refute defendant's contention that money given to her by the victim was in repayment for loans made by defendant to the victim. The trial court did not abuse its discretion by declining to exclude this evidence under Rule 403 on the ground that any probative value was substantially outweighed by the danger of unfair prejudice.

**Am Jur 2d, Evidence §§ 558 et seq.**

**6. Evidence and Witnesses § 179 (NCI4th)— life insurance— change of beneficiary—motive for killing**

Evidence that defendant sold a murder victim two life insurance policies and that both policies were amended to make defendant the primary beneficiary was relevant to show a motive for the killing. Assuming arguendo that the order of a superior court judge requiring the insurance company to pay $300,000 into court pending a determination of the parties' rights should not have been admitted, defendant cannot show that there is a reasonable possibility that, had the order not been admitted, a different outcome would have been reached at trial.

**Am Jur 2d, Evidence §§ 558 et seq.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417, sec. 1.**

**7. Evidence and Witnesses § 1259 (NCI4th)— exercise of right to remain silent—testimony by SBI agent—not plain error**

Assuming that an SBI agent's testimony that he did not interview defendant again because he was advised by her boyfriend that she had an attorney and that he should not attempt to interview her again constituted improper evidence of defendant's exercise of her right to remain silent, the admission of this testimony was not plain error since any damage to defendant's credibility caused by the SBI agent's statement was de minimis compared with defendant's own trial testimony in which she

abandoned her alibi and asserted that she was an innocent bystander while her boyfriend, acting alone, killed the victim.

**Am Jur 2d, Criminal Law §§ 788 et seq.; Evidence §§ 748-753.**

**8. Evidence and Witnesses § 2942 (NCI4th)— prearrest silence—impeachment of defendant—no denial of federal constitutional rights**

The use of defendant's prearrest silence to impeach defendant during cross-examination when the prosecutor inquired into defendant's failure to talk with law officers after her interview by an SBI agent a few days after a murder did not violate defendant's federal constitutional rights where defendant was not induced to remain silent prior to her arrest by any government assurances that her silence would not be used against her; defendant did not invoke or rely upon her right to remain silent; and defendant denied any involvement in the crime when she talked with the SBI agent. U. S. Const. amends. V and XIV.

**Am Jur 2d, Witnessess § 539.**

**9. Evidence and Witnesses § 2942 (NCI4th)— prearrest silence—impeachment of defendant—improper under N.C. law—no plain error**

Assuming arguendo that the prosecutor's questions on cross-examination of defendant inquiring into defendant's failure to talk with law officers after her interview by an SBI agent a few days after a murder constituted an improper use of her prearrest silence for impeachment pursuant to rules of evidence formulated by our jurisdiction, any error in the trial court's failure to limit the prosecutor's questions did not rise to the level of plain error where there was evidence tending to show that defendant made a false statement to the SBI agent, this statement was inconsistent with defendant's trial testimony and was highly damaging to her credibility, and questions about her subsequent failure to speak to law officers did not further damage her credibility.

**Am Jur 2d, Witnesses § 539.**

**10. Evidence and Witnesses § 264 (NCI4th)— character of victim—improper testimony—not plain error**

Assuming that testimony by a murder victim's mother that the victim was "beautiful," "loving," "very gentle," and "her best friend" was improper character evidence, the admission of this testimony was not plain error where evidence by both the State and the defendant tended to characterize the victim in positive terms.

**Am Jur 2d, Evidence §§ 363 et seq.**

**Admissibility, in prosecution for maintaining liquor nuisance, of evidence of general reputation of premises. 68 ALR2d 1300.**

**11. Evidence and Witnesses § 1688 (NCI4th)— photograph of murder victim while alive—admissible for illustrative purposes**

A photograph of a murder victim while she was alive was admissible to illustrate her mother's testimony which described the color of her daughter's hair and which was relevant to show that the victim did not fit the description of a woman seen on the day before the murder purchasing oil lamps found in the mother's house where the victim was killed.

**Am Jur 2d, Evidence § 1451.**

**12. Evidence and Witnesses § 3019 (NCI4th)—prior convictions—misleading testimony—opening door—details of crimes**

Where defendant gave misleading testimony on direct examination that her two prior fraud convictions resulted from a mere failure to report two insurance premiums, defendant opened the door to the prosecutor's questions about the details of her prior crimes.

**Am Jur 2d, Witnesses §§ 905-909.**

**13. Evidence and Witnesses § 3027 (NCI4th)— taking money from boyfriend—character for untruthfulness—inquiry properly allowed**

The purpose of the prosecutor's cross-examination of a defendant charged with murder as to whether she had taken money from her former boyfriend by forging his name on both a

loan application and a check and cashing the check without his permission was to show conduct indicative of defendant's character for untruthfulness, and the trial court did not abuse its discretion under N.C.G.S. § 8C-1, Rule 608(b) by allowing this inquiry.

**Am Jur 2d, Witnesses §§ 901-904, 968, 969.**

**14. Evidence and Witnesses § 2786 (NCI4th)— cross-examination—assumption of fact not in evidence—absence of prejudice**

Even if the trial court erred by permitting the prosecutor to ask the defendant in a murder trial whether she was "aware that [the victim] also went to her attorney . . . and expressed concern that you hadn't paid her" because the question assumed a fact not in evidence, defendant cannot show prejudice by the court's ruling where three witnesses gave testimony suggesting that defendant owed the victim money, that the victim had begun to document that debt, and that the victim intended to seek repayment of the money defendant owed her.

**Am Jur 2d, Witnesses § 750.**

**15. Criminal Law § 478 (NCI4th Rev.)— prosecutor's question—not attempt to humiliate defendant—legitimate purpose**

The trial court could have reasonably concluded that the prosecutor's question to a defendant on trial for murder as to whether she cried more at the crime scene "than you cried today" was not designed to simply badger and humiliate the witness but rather was designed to challenge defendant's testimony on direct examination that she was hysterical and crying at the scene of the crime.

**Am Jur 2d, Trial §§ 1562, 1564.**

**16. Evidence and Witnesses § 607 (NCI4th)— instances of bad character—admissibility for rebuttal—another instance not plain error**

Testimony by defendant's former boyfriend that defendant changed the beneficiary on his life insurance policy without his knowledge and that defendant took the accrued value of his life insurance policy without his consent, even though ordinarily inadmissible as specific instances of bad character, was properly

admitted to rebut and discredit defendant's testimony that her actions were taken with the boyfriend's knowledge and consent. Even if further testimony by the boyfriend that defendant moved out of his home because he and defendant had a disagreement over a horse sale and "there was some money missing" did not relate to any of defendant's testimony and was inadmissible for rebuttal or any other purpose, any error in the trial court's failure to exclude this testimony did not amount to plain error where the State presented substantial evidence tending to impeach defendant's credibility, and the former boyfriend testified that defendant subsequently moved back into his home.

**Am Jur 2d, Witnesses §§ 837-844, 900, 956.**

**17. Criminal Law § 431 (NCI4th Rev.)— closing argument—mother's failure to testify—avoidance of perjury—no gross impropriety**

Any impropriety in the prosecutor's argument to the jury in a murder case suggesting that defendant's mother did not take the stand in order to avoid committing perjury was not so grossly improper as to require the trial court to intervene ex mero motu where the State's evidence suggested that defendant's mother agreed after the murder to support any story that defendant and her accomplice might tell, and the absence of contradictory evidence was the essence of the prosecutor's argument.

**Am Jur 2d, Trial §§ 609 et seq.**

**18. Criminal Law § 445 (NCI4th Rev.)— closing argument—criminal conduct will "cost" witness—no impropriety**

The prosecutor's closing argument in a first-degree murder trial that defendant's boyfriend, an accomplice in the murder and a witness for the State, would be found guilty of second-degree murder and that his criminal conduct would "cost him" was supported by the evidence presented at trial and was properly made in response to defense counsel's argument that the boyfriend had not been punished for his role in the crime.

**Am Jur 2d, Trial §§ 632-639.**

**19. Criminal Law § 436 (NCI4th Rev.)— closing argument—no misstatement or misleading statement of evidence**

The prosecutor's closing argument in a first-degree murder case that he didn't ask defendant about the number of car keys

because her answer would be, "May I explain? There were two car keys" did not misstate defendant's testimony or mislead the jury concerning what was in evidence; rather, the purpose of the argument was to show that defendant's testimony that her boyfriend asked her for her car keys while he was driving her car from the crime scene did not make any sense and to question defendant's credibility by noting her manner of answering questions. Therefore, the argument was not so grossly improper as to require the trial court to intervene ex mero motu.

**Am Jur 2d, Trial § 611.**

**20. Criminal Law § 448 (NCI4th Rev.)— closing argument— community sentiment—no impropriety**

The prosecutor's closing argument in a first-degree murder case did not improperly urge the jury to "lend its ear" to anticrime sentiment in the community and to convict defendant in order to "do something" about crime but merely referred to community sentiment and urged the jury to render a verdict justified by the evidence.

**Am Jur 2d, Trial §§ 644 et seq.**

**21. Homicide § 374 (NCI4th)— first-degree murder—acting in concert—sufficiency of evidence**

The trial court did not err by instructing the jury that it could find defendant guilty of first-degree murder under the theory of acting in concert where the State's evidence tended to show that defendant asked her boyfriend to help her "rough up" the victim, that the boyfriend went to the home of the victim's mother with the intent of helping defendant assault the victim, and that defendant and her boyfriend acted together to beat and stab the victim to death; defendant provided her boyfriend with a wooden baton and knife that the boyfriend used to beat and stab the victim, defendant personally beat the victim, and defendant personally inflicted the stab wounds that caused the victim's death; defendant started a fire after killing the victim, took the lead in concocting and refining an "alibi story," and urged her boyfriend to "stick" to this story; and the boyfriend helped defendant dispose of evidence and made statements to law officers that he and defendant were together at the time of the killing. The evidence was sufficient to show that defendant acted with premeditation and deliberation and to show not only that the victim's murder

was a natural or probable consequence of the joint purpose of defendant and her boyfriend to commit a crime, but that defendant and her boyfriend acted together pursuant to a joint purpose to murder the victim.

**Am Jur 2d, Trial §§ 1077 et seq.**

**22. Arson and Other Burnings § 29 (NCI4th); Criminal Law § 805 (NCI4th Rev.)-second-degree arson—acting in concert—sufficiency of evidence**

The trial court did not err by instructing the jury that it could find defendant guilty of second-degree arson under the theory of acting in concert where the State's evidence tended to show that defendant and her boyfriend acted together to kill the victim and that the boyfriend was present when defendant poured oil over the victim's body and set it on fire; the boyfriend subsequently drove defendant to defendant's trailer and assisted defendant in disposing of their bloody clothing; defendant and her boyfriend agreed on an alibi; and both initially gave statements to the police denying any involvement in the crime.

**Am Jur 2d, Arson and Related Offenses § 55.**

**23. Homicide § 583 (NCI4th)— first-degree murder—acting in concert—instructions on specific intent**

The trial court's instructions on acting in concert in a first-degree murder trial were not erroneous under *State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44, because they included the phrase "either acting by herself or together with another" in the instruction on each of the elements relating to specific intent. Moreover, the instructions also complied with the rule in *State v. Blankenship*, 337 N.C. 543, 447 S.E.2d 727, which was overruled by *Barnes*, where they made it clear that, in order to convict defendant, defendant herself must have had the requisite specific intent.

**Am Jur 2d, Trial §§ 1077 et seq.**

**24. Criminal Law § 771 (NCI4th Rev.)— instructions—reasonable doubt—insufficient evidence as basis**

The trial court's instructions on reasonable doubt sufficiently informed the jury that reasonable doubt could arise out of the insufficiency of the evidence where the instruction informed the jury that a reasonable doubt may arise out of "some or all of

the evidence that has been presented, or a lack of that evidence, as the case may be" and that a reasonable doubt may be generated by an "insufficiency of the proof."

**Am Jur 2d, Trial §§ 1371 et seq.**

**25. Criminal Law § 770 (NCI4th Rev.)— instructions—reasonable doubt—ingenuity of counsel—what reasonable doubt was not**

The trial court's instruction that a "reasonable doubt is not a doubt suggested by ingenuity of counsel or by your own ingenuity not legitimately warranted by the testimony" did not preclude the jury from considering ingenuity of counsel legitimately warranted by the testimony. Furthermore, the trial court did not err by instructing the jury as to what reasonable doubt was "not."

**Am Jur 2d, Trial §§ 1371 et seq.**

**26. Criminal Law § 773 (NCI4th Rev.)— instructions—reasonable doubt—use of "moral certainty" and "honest substantial misgiving"**

The trial court did not use the phrases "moral certainty" and "honest substantial misgiving" in its instructions on reasonable doubt in a manner that unconstitutionally reduced the State's burden of proof.

**Am Jur 2d, Trial §§ 1371 et seq.**

**27. Criminal Law § 1200 (NCI4th Rev.)— arson—aggravating factor—damage causing great monetary loss**

The evidence supported the trial court's finding as an aggravating factor for arson that the offense involved property damage causing great monetary loss where the State presented evidence that the house that was burned was a frame, single-story house with two bedrooms, a living room, a kitchen, a den, and a porch; two persons resided in the house; the owner testified that the house had a replacement value of $80,000 and was a "complete loss"; an assistant fire marshall testified that it took firemen two hours to suppress the flames and that one-third of the house had flames coming through the roof; and the State presented photographs showing the house as it appeared before and after the fire. N.C.G.S. § 15A-1340.16(d)(14).

**Am Jur 2d, Arson and Related Offenses §§ 33, 40-51.**

**28. Criminal Law § 970 (NCI4th Rev.)— first-degree murder—denial of motion for appropriate relief—new witness not truthful**

The trial court did not abuse its discretion in denying defendant's motion for appropriate relief in a first-degree murder case on the basis of newly discovered evidence where a witness who contacted defendant's attorney after the jury found defendant guilty of murder testified that he was an eyewitness to the murder and that defendant's boyfriend was solely responsible for the victim's killing; the evidence at the hearing supported the trial court's finding that the State's cross-examination of the witness and the testimony of other witnesses "tended to substantially question his character for truthfulness and veracity"; and this finding supported the trial court's conclusions that the testimony of the new witness was not true and that the testimony was not of such a nature as to show that a different result would probably be reached at another trial.

**Am Jur 2d, Coram Nobis and Allied Statutory Remedies §§ 44 et seq.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Downs, J., at the 25 May 1992 Mixed Session of Superior Court, Buncombe County, upon a jury verdict of guilty of first-degree murder. Defendant also appeals from an order, entered 6 May 1994, denying her post-trial motion for appropriate relief. Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for second-degree arson was allowed on 28 November 1995. Heard in the Supreme Court 10 September 1996.

*Michael F. Easley, Attorney General, by John G. Barnwell, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Defendant Mamie Delois Jean Bishop was tried capitally on indictments charging her with first-degree murder and first-degree arson. The jury found defendant guilty of first-degree murder and second-degree arson. Following a capital sentencing proceeding, the jury recommended a sentence of life imprisonment; and the trial

court entered judgment accordingly. The trial court also imposed a consecutive sentence of forty years' imprisonment for second-degree arson. For the reasons discussed herein, we conclude that defendant's trial was free from prejudicial error.

The State's evidence tended to show the following. On 24 or 25 July 1988 defendant and her boyfriend, Arthur John Boergert, killed Glenda Sue Nelson ("victim") at the Buncombe County home of the victim's mother and stepfather, Ava and Vonno Payne.

The victim was an accountant who worked and lived in New Jersey. On the weekend of the killing, she was staying at the Paynes' house while they were out of town. The victim had been a close friend of defendant's since 1984, and defendant had handled real estate transactions and horse sales for the victim. Between 1986 and 1988 the victim transferred to defendant approximately $30,000 by check, money order, and wire transfer; and the victim apparently considered these transfers to be cash advances. In early 1988 the victim made statements indicating that she was concerned that defendant had been stealing money from the sale of her property and that the victim had not been paid for horses that defendant had sold for her. The victim made statements to Dee Dickerson and Joseph Nelson indicating that she was attempting to document the amount owed her by defendant and that she intended to confront defendant about the debt. On 7 March 1988 the victim asked defendant to sign a promissory note in the amount of $40,753, and defendant did so.

On Sunday, 24 July 1988, defendant told Boergert that the victim had been harassing her, that the victim wanted money for a $10,000 check, and that she wanted to get the victim "off her back." Defendant asked Boergert to help her "rough [the victim] up a little bit and that would be the end of it."

At some time after 11:00 p.m. on 24 July, defendant met the victim at the J & S Cafeteria. From that location they took the victim's car to the Paynes' house. Following defendant's instructions Boergert drove his truck to the J & S Cafeteria, left his truck in the parking lot, took defendant's car, and proceeded to the Paynes' house. Boergert entered the house and saw defendant and the victim fighting. Using a wooden baton given to him by defendant earlier in the evening, Boergert hit the victim on the back of the head. Defendant took the baton from Boergert and beat the victim until the baton broke.

Defendant tossed Boergert a folding, lock-blade knife and told him to open it. Boergert opened the knife and stabbed the victim twice. Defendant then grabbed the knife and stabbed the victim repeatedly, inflicting numerous stab wounds including several to the victim's neck. The medical examiner testified that stab wounds to the victim's neck were the cause of death.

Defendant retrieved two oil lamps from a bedroom. She poured oil from one of the lamps onto the victim's body, smashed the other lamp on the floor, and rolled the victim's body into the resulting puddle of oil. She then started a fire which charred the victim's body and damaged the Paynes' house.

Defendant and Boergert left the Paynes' house in defendant's car and drove to her trailer. They put their bloody clothes in a garbage bag which they later threw into a river. Defendant told Boergert that they had to concoct an alibi in order to avoid arrest. They decided to say that they took a ride in defendant's car after working late Sunday evening, returned to defendant's trailer, and then went to the J & S Cafeteria to retrieve Boergert's truck.

The following day defendant and Boergert talked with defendant's mother, and she agreed to confirm any story defendant and Boergert might tell. Defendant and Boergert were interviewed by law enforcement officers two or three days after the murder, and they gave statements consistent with their story. A week or two after the murder, defendant and Boergert refined the story and had it transcribed. The State's evidence suggested that defendant took the lead in developing and refining the "alibi story" and that she later encouraged Boergert to "stick" to the story.

A short time after the murder, defendant ended her relationship with Boergert and moved into a house owned by her former boyfriend, Howard Treadway. Defendant told Boergert that she was the beneficiary of a $100,000 life insurance policy on the victim's life and promised to give Boergert $25,000 from the proceeds.

Defendant was a life insurance agent, and the evidence showed that she sold the victim two life insurance policies several years before the killing. In 1987 the policies were amended with defendant's knowledge to make defendant the primary beneficiary and defendant's daughter the contingent beneficiary. A short time after the murder, defendant filed a claim against Home Beneficial Insurance Company seeking $300,000 on the life insurance policies.

In May 1989 Boergert made a statement to law enforcement offi-
cers which implicated defendant. He subsequently agreed to meet
with defendant, to wear a "wire," and to record their conversation.
During this meeting defendant assured Boergert that the police did
not have any evidence against them and urged him to "stick" to their
story. Defendant was arrested and charged with the victim's murder
a short time later.

Defendant testified that Boergert killed the victim in a jealous
rage. She stated that she and the victim were alone at the Paynes'
house when Boergert entered the house and angrily made a statement
suggesting that he believed that defendant and the victim were hav-
ing a lesbian affair. Over defendant's protests Boergert killed the vic-
tim and set the house ablaze. Defendant stated that she owed the
victim only $3,500 at the time of the murder. She explained that she
loaned the victim $30,000 in 1986 and that the victim repaid that loan
over the next few years. She stated that the reason she did not con-
tact the police or reveal her presence at the murder scene was that
Boergert threatened her and members of her family. Defendant's evi-
dence suggested that an attorney advised her to file a claim against
the insurance company that issued the victim's life insurance policies
to find out whether she was a suspect in the victim's death.

Additional facts will be presented as necessary to address
specific issues.

## GUILT-INNOCENCE PHASE

By her first assignment of error, defendant argues that statements
made by the victim to three witnesses constituted inadmissible and
irrelevant hearsay. She also argues that the trial court erred by admit-
ting various writings related to the victim's finances.

Dee Dickerson testified that Commercial Credit Corporation
made a $5,000 loan to the victim. She stated that she distributed the
proceeds of this loan to the victim by giving the victim two checks.
The checks were introduced into evidence and tended to show that
the proceeds of the loan were ultimately transferred to defendant.
One of the checks was made payable to defendant; the other was
made payable to the victim. The victim endorsed the check made
payable to her and gave it to defendant, and defendant cashed it.
Eight weeks before she was killed, the victim called Dickerson and
requested copies of both checks. Dickerson testified that the victim
told her that she needed the copies "because [defendant] was saying

that she did not owe her any money and she needed the documents to prove . . . that [defendant] did, indeed, owe her this money plus other monies."

Joseph Nelson, the victim's brother, testified that the victim told him that "she was concerned that [defendant] was stealing the money . . . from the real estate sale of her property." The victim also told Nelson that she was "planning to get an injunction against [defendant] to collect the money that she owed her." Nelson further testified that the victim stated that she had not been paid for horses that defendant had sold for her.

Ava Payne, the victim's mother, gave testimony during the State's rebuttal case with respect to a 7.3-acre parcel of land owned by the victim. The victim told Payne that defendant had not sold the land "because there was some restrictions on the land and she had to send . . . [defendant] money to lift" the restrictions.

Defendant argues that these statements constituted irrelevant and inadmissible hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). "[W]henever an extrajudicial statement is offered for a purpose other than proving the truth of the matter asserted, it is not hearsay." *State v. Maynard*, 311 N.C. 1, 15-16, 316 S.E.2d 197, 205, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984).

The trial court determined that the victim's statements fell within the state of mind exception to the hearsay rule, N.C.G.S. § 8C-1, Rule 803(3) (1992), which provides that "[a] statement of the declarant's then existing state of mind" is not excluded by the hearsay rule. "Evidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand." *State v. Stager*, 329 N.C. 278, 314, 406 S.E.2d 876, 897 (1991). The victim's state of mind is relevant if it bears directly on the victim's relationship with the defendant at the time the victim was killed. *See State v. Westbrooks*, 345 N.C. 43, 59, 478 S.E.2d 483, 493 (1996); *State v. McLemore*, 343 N.C. 240, 246, 470 S.E.2d 2, 5 (1996). We have also stated that "a victim's state of mind is relevant if it relates directly to circumstances giving rise to a potential confrontation with the defendant." *McLemore*, 343 N.C. at 246, 470 S.E.2d at 5.

[1] Several of the victim's statements to Dickerson and Nelson expressed her concern about defendant's handling of her real estate transactions and her intent to document defendant's debt, to seek

repayment, and to confront defendant about her concern that defendant had stolen from her. These statements bore directly on the relationship between the victim and defendant at the time of the killing and were relevant to show a motive for the killing—that defendant was in debt to the victim, that defendant was refusing to repay the amount owed or to reimburse the victim for money taken from the victim, and that the victim was insisting that defendant pay. Accordingly, the statements were properly admitted pursuant to the state of mind exception to the hearsay rule.

[2] The victim also made a statement to her brother indicating that she had not been paid for horses that defendant had sold for her and a statement to her mother indicating that she had sent money to defendant to lift restrictions on property which defendant was selling for her. Even if we assume *arguendo* that these statements were admitted for the truth of the matter asserted and did not relate to the victim's state of mind, their admission did not prejudice defendant. Dickerson and Nelson gave testimony suggesting that the victim intended to confront defendant with respect to financial concerns. Boergert testified that defendant told him that the victim had been harassing her and that defendant told him that the victim wanted money for a $10,000 check. Boergert also gave eyewitness testimony which tended to show that defendant planned, directed, and participated in the murder of the victim. After the murder defendant took the lead in creating and refining an alibi and encouraged Boergert to "stick" to this story. In light of this evidence, defendant cannot show that there is a reasonable possibility that, had the trial court excluded the statements at issue, a different result would have been reached at trial. *See* N.C.G.S. § 15A-1443(a) (1988).

The trial court also admitted various writings which had been in the victim's possession and which related to the victim's financial transactions with defendant. This evidence included (i) the victim's check register books, showing numerous checks and wire transfers to defendant; (ii) a list made by the victim documenting checks, money orders, and wire transfers to defendant; (iii) handwritten notations made by the victim, consisting of calculations which corresponded to the amounts the victim believed defendant owed her; (iv) a small spiral notebook memo pad containing various notes; (v) a handwritten writing made by the victim placing dollar amounts of $5,578 on land, $29,425 on cash advances, and $5,750 on horses, for a total of $40,753; and (vi) a 7 March 1988 $40,750 "promissory note" signed by defendant, made payable to the victim, and containing a

handwritten provision made by the victim. Defendant argues that this evidence constituted inadmissible and irrelevant hearsay.

**[3]** The promissory note was not admitted into evidence solely to show the truth of the matter asserted—that defendant promised to pay the victim $40,750. Rather, the note tended to show that several months before the killing, the victim confronted defendant about the debt and sought repayment for the money defendant owed. The note was relevant to establish a possible motive for the killing and was properly admitted into evidence.

**[4]** We also conclude that the check register books; the list of checks, money orders, and wire transfers to defendant; the calculations; the notes in the spiral notebook; and the writing placing a value of $40,753 on land, cash advances, and horses were admissible for the non-hearsay purpose of showing that the victim had followed through with her stated intention to document defendant's debt. Viewed in conjunction with the evidence that the victim had actually confronted defendant by asking her to sign a promissory note and Boergert's testimony that defendant had told him the victim had been harassing her about money, this evidence was relevant to show a motive for the killing.

Even if we assume *arguendo* that some or all of the victim's writings were inadmissible hearsay, any error in admitting them did not prejudice defendant. In addition to the victim's check register books and other writings, the State introduced checks, Western Union money transfer applications, and evidence of wire transfers charged to the victim's account at United Jersey Bank to show that the victim had transferred approximately $30,000 to defendant between 1986 and 1988. Defendant testified and admitted receiving approximately $30,000 from the victim during this time period, claiming that the victim gave her this money to repay a loan. Boergert's testimony confirmed that the victim had confronted defendant about the debt. He testified that on the day of the killing, defendant told him that the victim was harassing her, that she wanted to get the victim off her back, and that the victim wanted money for a $10,000 check. Boergert also gave testimony suggesting that defendant planned, directed, and participated in the victim's killing. In light of this evidence, defendant cannot show that there is a reasonable possibility that the outcome of her trial would have been different if the trial court had excluded the writings at issue. *See* N.C.G.S. § 15A-1443(a).

This assignment of error is overruled.

STATE v. BISHOP

[346 N.C. 365 (1997)]

**[5]** Defendant next contends that the trial court erred by admitting evidence relating to defendant's finances and financial transactions with the victim. She argues that this evidence was not relevant and that any probative value was substantially outweighed by the danger of unfair prejudice. The contested evidence includes statements made by defendant suggesting that she and the victim loaned money to each other, that the victim wired her money by way of Western Union, and that she owed the victim only $3,500 when the victim died. The evidence includes Dickerson's testimony that Commercial Credit Corporation loaned the victim approximately $5,000 in August of 1987 and that the proceeds of that loan were ultimately transferred to defendant. Defendant also argues that the court erred by admitting the following exhibits: (i) two checks from Commercial Credit Corporation, representing the proceeds of the $5,000 loan made to the victim and ultimately transferred to defendant; (ii) twelve checks, money orders, and wire transfers from the victim to defendant; (iii) defendant's bank records and tax returns; and (iv) the deed and a package of writings pertaining to defendant's sale of a 7.3-acre piece of property owned by the victim.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Generally, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (1992). This Court has consistently stated that "in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994).

Relevant evidence may, however, be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1992). "Whether to exclude relevant but prejudicial evidence under Rule 403 is a matter left to the sound discretion of the trial court." *State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992).

The victim's cash advances to defendant and the victim's real estate dealings with defendant shed light on their relationship at the time of the victim's death. This evidence, in conjunction with the victim's statements suggesting that the victim intended to confront

**STATE v. BISHOP**

[346 N.C. 365 (1997)]

defendant about defendant's debt and defendant's statements to Boergert suggesting that the victim actually confronted defendant, was relevant to show that defendant had a motive to kill the victim. Defendant's tax returns tended to show that defendant did not earn enough money to loan the victim $30,000 and refuted defendant's suggestion that the money given to her by the victim was in repayment for loans made by defendant to the victim. We conclude that the evidence at issue was relevant and that the trial court did not abuse its discretion by declining to exclude this evidence pursuant to Rule 403.

Defendant next contends that the trial court erred by permitting the prosecutor to ask defendant questions during cross-examination with respect to her financial, real estate, and horse transactions with the victim; her bank records; her tax returns; the writings of the victim found in the victim's apartment; and the money given to her by the victim. We conclude that the prosecutor's inquiries were relevant and that the court did not abuse its discretion under Rule 403 by permitting the prosecutor to cross-examine defendant with respect to these subjects.

This assignment of error is overruled.

[6] By her next assignment of error, defendant contends that the trial court erred by admitting into evidence an order entered by a superior court judge in a civil action initiated by defendant. Defendant sold the victim two life insurance policies, and both policies were amended in 1987 to make defendant the primary beneficiary. After the killing defendant instituted a civil action against the insurer to collect the proceeds of the policies. On 9 June 1989 Superior Court Judge Hollis M. Owens entered an order requiring the insurance company to pay into the court the sum of $300,000 and further ordered that this sum be held by the clerk of court until a final determination had been made with respect to the rights of the parties. Defendant argues that the 9 June 1989 order was irrelevant, inadmissible hearsay and that any probative value was substantially outweighed by the danger of unfair prejudice.

We first note that the evidence that defendant sold the victim two life insurance policies and that both policies were amended to make defendant the primary beneficiary was relevant to show a motive for the killing. *See State v. White*, 340 N.C. 264, 292, 457 S.E.2d 841, 857-58, *cert. denied*, 116 U.S. 530, 133 L. Ed. 2d 436 (1995). Assuming *arguendo* that the order requiring the insurance company to pay $300,000 into the court pending a determination of the parties'

rights was not admissible, we conclude that defendant cannot show that there is a reasonable possibility that, had the order not been admitted, a different outcome would have been reached at trial. *See* N.C.G.S. § 15A-1443(a). Contrary to defendant's assertion before this Court which was not raised in the court below, the order was not a record of judicial findings in a prior civil action. The order contained no findings which could have prejudiced defendant. This assignment of error is overruled.

[7] Defendant next contends that the trial court committed plain error by permitting the prosecution to elicit testimony commenting on defendant's exercise of her rights to silence and counsel in violation of her rights under the Fifth Amendment and Article I, Section 23 of the North Carolina Constitution. At trial the following colloquy occurred between the prosecutor and SBI Agent Tim Shook:

Q So the day you interviewed [defendant] was, in fact, her thirty-seventh birthday?

A That's correct.

Q Did you ever talk to Defendant Bishop again?

A No.

Q Did you ever talk to A.J. Boergert after that day?

A Yes, sir, I did.

Q And when was that?

A It was approximately a week after this interview.

Q And where did you talk to him.

A It was a telephone conversation. I called him at the number provided by [defendant] . . . .

Q Did you ever interview Defendant Bishop again?

A No.

Q Why not?

A I was advised that she had an attorney and to not attempt to interview her again.

Q When were you advised of that?

A When I talked to Mr. A.J. Boergert.

Defendant argues that this statement was substantive evidence of her exercise of her right to remain silent and that the trial court erred by failing to intervene. Defendant is correct in her assertion that the exercise of her constitutionally protected rights to remain silent and to request counsel during interrogation may not be introduced as evidence against her by the State at trial. *State v. Ladd*, 308 N.C. 272, 283-84, 302 S.E.2d 164, 171-72 (1983); see also *State v. Elmore*, 337 N.C. 789, 792, 448 S.E.2d 501, 502 (1994). However, even when a defendant objects, this constitutional error will not merit a new trial where the State shows that the error was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b). Where, as in this case, a defendant has failed to object, the defendant has the burden of showing that the error constituted plain error, that is, (i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial. *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988); *see also State v. Walker*, 316 N.C. 33, 38-39, 340 S.E.2d 80, 83-84 (1986). Assuming *arguendo* that the trial court erred in admitting Agent Shook's testimony, we conclude defendant has failed to show plain error. The evidence against defendant was substantial. Any damage to defendant's credibility caused by Agent Shook's statement was *de minimis* compared with defendant's own trial testimony in which she abandoned her alibi and asserted that she was an innocent bystander while Boergert, acting alone, killed the victim. Under these circumstances a different result probably would not have been reached absent Agent Shook's comment on defendant's exercise of her right to remain silent, nor did the comment deprive defendant of a fair trial.

[8] Defendant also contends that questions posed to defendant during cross-examination constituted improper comment on defendant's exercise of her rights to silence and counsel.

Q Now, after you talked with Agent Shook and after [Boergert] came back from the beach, you and [Boergert] told law enforcement [officers] you didn't want to talk to [them] until you had lawyers, didn't you?

A I did not tell . . . law enforcement that I didn't want to talk to them. At no time did any officer ever speak with me and ask me to come in or anything until the night I was arrested.

Q Agent Shook sat down with you, didn't he?

A  After I spoke with Agent Shook and left his office, no one from law enforcement spoke directly to me until the night I was arrested.

Q  You were waiting for them to come seek you out again?

[DEFENSE COUNSEL]: I'll object to this line of questioning. He's commenting on her decision to remain silent.

COURT: Sustained.

The use of prearrest silence to impeach a defendant's credibility on cross-examination does not violate the Fifth or Fourteenth Amendment to the United States Constitution. *Jenkins v. Anderson,* 447 U.S. 231, 235-40, 65 L. Ed. 2d 86, 92-96 (1980); *accord Westbrooks,* 345 N.C. at 63, 478 S.E.2d at 495. In the present case defendant was not induced to remain silent prior to her arrest by any government assurances that her silence would not be used against her. Defendant did not invoke or rely upon her right to remain silent. She talked with Agent Shook a few days after the murder and denied any involvement in the crime. Under these circumstances the use of defendant's pre-arrest silence to impeach her testimony did not violate her federal constitutional rights.

[9] However, the determination that the use of defendant's prearrest silence for impeachment purposes did not violate her federal constitutional rights does not end our inquiry. *See Westbrooks,* 345 N.C. at 63-64, 478 S.E.2d at 495. In *Jenkins* the Supreme Court stated that

[e]ach jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative.

*Jenkins,* 447 U.S. at 239, 65 L. Ed. 2d at 95. We look to our opinion in *State v. Lane,* 301 N.C. 382, 271 S.E.2d 273 (1980), to analyze defendant's contention that her rights were violated by the use of her prearrest silence pursuant to the rules of evidence formulated by our jurisdiction. *See Westbrooks,* 345 N.C. at 64, 478 S.E.2d at 496.

In *Lane* we addressed the issue of allowing the prosecutor to use evidence of the defendant's pre-*Miranda* silence to impeach the defendant during cross-examination. The defendant stated prior to receiving any *Miranda* warnings, "Hell, I sold heroin before, but I didn't sell heroin to this person." *Lane,* 301 N.C. at 382, 271 S.E.2d at 274. The defendant testified at trial that he had an alibi for the crime

for which he was being tried. On cross-examination the prosecutor asked the defendant why he had not told the police about this alibi prior to trial. In determining whether the cross-examination was permissible, we noted:

> "Prior statements of a witness which are inconsistent with his present testimony are not admissible as substantive evidence because of their hearsay nature. Even so, such prior inconsistent statements are admissible for the purpose of impeachment. . . .
>
> " '. . . [I]f the former statement fails to mention a material circumstance presently testified to, *which it would have been natural to mention in the prior statement,* the prior statement is sufficiently inconsistent,' . . . . [Citations omitted.] [Emphasis added.]"

*Id.* at 386, 271 S.E.2d at 276 (quoting *State v. Mack,* 282 N.C. 334, 339-40, 193 S.E.2d 71, 75 (1972)) (citations omitted) (alterations in original). We stated in *Lane* that "[t]he crux of this case is whether it would have been natural for defendant to have mentioned his alibi defense at the time he voluntarily stated [to the police] that he 'did not sell heroin to this person.' " *Id.*

Even assuming *arguendo* that the prosecutor's questions in this case inquiring into defendant's failure to talk with law enforcement officers after her interview with Agent Shook and prior to her arrest were not within the scope of inquiry permitted under *Lane,* we nevertheless conclude that this inquiry did not prejudice defendant. The State presented evidence that defendant talked to Agent Shook, denied any involvement in the crime, and stated that she and Boergert were elsewhere at the time of the crime. This statement was inconsistent with her testimony at trial, was properly admitted into evidence, and was highly damaging to defendant's credibility. Additionally, other evidence suggested that defendant spent much effort and even money to sustain the alibi she originally told law enforcement officers. In light of the evidence tending to show that defendant made a false statement to Agent Shook, questions about her subsequent failure to speak to law enforcement officers did not further damage her credibility. Accordingly, on the record before us, we conclude that any error in failing to limit the prosecutor's questions with respect to defendant's prearrest silence did not rise to the level of plain error.

This assignment of error is overruled.

STATE v. BISHOP

[346 N.C. 365 (1997)]

**[10]** Defendant contends that the trial court committed plain error by permitting Ava Payne to testify to the victim's good character. Payne, the victim's mother, cried on the stand while testifying that the victim was "beautiful," "loving," "very gentle," and "her best friend." Even if we assume *arguendo* that this testimony was inadmissible, under the plain error standard, defendant has failed to satisfy her burden of showing prejudice. Both the State's evidence and defendant's evidence tended to characterize the victim in positive terms.

**[11]** Defendant also contends that the trial court committed plain error by admitting into evidence a photograph of the victim while alive. " 'Photographs are usually competent to be used by a witness to explain or illustrate anything that it is competent for him to describe in words.' " *State v. Watson*, 310 N.C. 384, 397, 312 S.E.2d 448, 457 (1984) (quoting *State v. Cutshall*, 278 N.C. 334, 347, 180 S.E.2d 745, 753 (1971)). "[W]e have repeatedly held that showing photographs of victims made during their lives is not prejudicial error." *State v. Norwood*, 344 N.C. 511, 532, 476 S.E.2d 349, 358 (1996), *cert. denied,* —— U.S. ——, 137 L. Ed. 2d 500 (1997); *accord State v. Goode*, 341 N.C. 513, 539-40, 461 S.E.2d 631, 646-47 (1995). In the present case the trial court admitted a photograph of the victim which had been taken in December 1987. This photograph was admissible to illustrate Payne's testimony, which described the color of her daughter's hair and which was relevant to show that the victim did not fit the description of a woman who was seen on the day before the murder purchasing oil lamps similar to the lamps found in the Paynes' house.

This assignment of error is overruled.

**[12]** By her next assignment of error, defendant contends that the trial court erred by permitting the prosecutor to pursue improper lines of inquiry during his cross-examination of defendant. Defendant first argues the prosecutor questioned her about the details of prior crimes in violation of N.C.G.S. § 8C-1, Rule 609(a):

Q  You just answered [defense counsel's] question with regard to the prior record. I believe you said everything was years back; is that right?

A  Yes, sir. The insurance fraud took place after I was arrested, and it was two counts. I had some insufficient checks in the past which I paid every dime of the money back.

Q  Well, actually, the two counts of insurance [fraud] you just mentioned, you took a little old man's money, two thousand dollars, in September of '87, didn't you.

A That's what we're speaking of, sir.

Q And that was before the murder, wasn't it.

A Yes, but I was not charged until after.

Q And after the murder you took another lady's money, didn't you.

A Yes, sir.

Q Took three hundred dollars from her?

A Yes, and I would have put it back.

Q On each of those you gave those people a receipt and didn't turn the money in and pocketed the cash, didn't you.

A Yes, sir.

"The permissible scope of inquiry into prior convictions for impeachment purposes is restricted . . . to the name of the crime, the time and place of the convictions, and the punishment imposed." *State v. Lynch*, 334 N.C. 402, 409, 432 S.E.2d 349, 352 (1993). However, "[t]his Court has consistently permitted the introduction of evidence in explanation or rebuttal of a particular fact or transaction even though such latter evidence would be incompetent or irrelevant had it been offered initially." *State v. Alston*, 341 N.C. 198, 234, 461 S.E.2d 687, 706 (1995), *cert. denied*, 116 U.S. 1021, 134 L. Ed. 2d 100 (1996). Such evidence is admissible to correct inaccuracies or misleading omissions in a defendant's testimony or to dispel inferences favorable to defendant arising therefrom. *Lynch*, 334 N.C. at 412, 432 S.E.2d at 354.

> For example, when the defendant "opens the door" by misstating his criminal record or the facts of the crimes or actions, or when he has used his criminal record to create an inference favorable to himself, the prosecutor is free to cross-examine him about details of those prior crimes or actions.

*Id.*

On direct examination defense counsel asked defendant whether she had been convicted of or had pleaded guilty to any crimes. Defendant responded in the affirmative and described her convictions in the following manner:

> I failed to report two premiums of policy holders. And I also have—or had some insufficient checks which I called the magis-

trate's office and told them in advance that they would be coming in, and they, in turn, called me. I came in and paid them. But we're talking about years back. We're not talking about at the time of this.

Defendant volunteered information concerning the nature and circumstances of her convictions on direct examination. She suggested that her insurance fraud convictions resulted from a mere failure to report two premiums. This testimony was misleading and "opened the door" to the prosecutor's questions.

**[13]** Defendant next contends that the trial court erred by allowing the prosecutor to cross-examine defendant with respect to whether she had taken money from Howard Treadway. Defendant argues that the prosecutor's questions related to specific instances of conduct which were not probative of truthfulness and that the inquiry violated N.C.G.S. § 8C-1, Rule 608(b).

Rule 608(b) provides that specific instances of conduct of a witness may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . concerning his character for truthfulness or untruthfulness." N.C.G.S. § 8C-1, Rule 608(b) (1992).

> Rule 608(b) of the North Carolina Rules of Evidence governs the admissibility of specific acts of misconduct where (i) the purpose of the inquiry is to show conduct indicative of the actor's character for truthfulness or untruthfulness; (ii) the conduct in question is in fact probative of truthfulness or untruthfulness; (iii) the conduct in question is not too remote in time; (iv) the conduct did not result in a conviction; and (v) the inquiry takes place during cross-examination. *See State v. Morgan*, 315 N.C. 626, 634, 340 S.E.2d 84, 89-90 (1986). "Among the types of conduct most widely accepted as falling into this category are 'use of false identity, making false statements on affidavits, applications or government forms (including tax forms), giving false testimony, attempting to corrupt or cheat others, and attempting to deceive or defraud others.' " *Id.* at 635, 340 S.E.2d at 90 (quoting 3 D. Louisell & C. Mueller, *Federal Evidence* § 305 (1979)).

*State v. Bell*, 338 N.C. 363, 382, 450 S.E.2d 710, 720 (1994), *cert. denied*, 515 U.S. 1163, 132 L. Ed. 2d 861 (1995).

Defendant argues that the prosecutor exceeded the scope of Rule 608(b) by asking whether defendant had taken money from her for-

**STATE v. BISHOP**

[346 N.C. 365 (1997)]

mer boyfriend, Howard Treadway. Defendant contends that taking money from a friend does not inherently involve dishonesty and that nothing in the context of the challenged questions suggested that the "taking" involved any deceit or was probative of defendant's truthfulness or untruthfulness. The record shows that the prosecutor's questions referred to two separate instances of alleged misconduct. The first instance related to the allegation that defendant applied for a loan against Treadway's life insurance policy on 13 May 1988 and that she forged Treadway's signature on the application. In response to the prosecutor's questions on cross-examination, defendant explained that she signed the application with Treadway's consent. Defendant stated that she received a check made payable to Treadway in the amount of $1,148.39, that she cashed the check and deposited the money in her checking account with Treadway's consent, and that she gave Treadway the money. The "taking" referred to by the prosecutor's inquiry involved the allegation that defendant forged Treadway's name on both a loan application and a check and that she cashed the check without Treadway's permission. We conclude that the purpose of the prosecutor's inquiry was to show conduct indicative of defendant's character for untruthfulness and that the trial court did not abuse its discretion under Rule 608(b) by allowing the inquiry.

The prosecutor subsequently asked defendant whether she had taken $2,000 from Treadway in June 1988. After defendant objected the court asked the jury to leave the courtroom and heard argument from counsel. The prosecutor told the court that the question related to a bad-check charge that had been dismissed after defendant reconciled with Treadway. The court never formally ruled on defendant's objection. Instead, the court told the prosecutor that the questions were "getting mighty collateral" and instructed him to "get back on the theme in mind, and that is the charges that she's facing." The prosecutor did not ask any further questions on this subject. We conclude that the trial court did not abuse its discretion in handling defendant's objection.

[14] Defendant next argues that the trial court erred by permitting the prosecutor to ask defendant whether she was "aware that [the victim] also went to her attorney, Steve Barden, and expressed concern that you hadn't paid her." The trial court overruled defendant's objection, and defendant responded that she was not aware of this fact. Defendant argues that there was no evidence to suggest that the victim ever expressed a concern to her attorney that defendant had

not paid her and argues that the objection should have been sustained on the ground that it assumed a fact not in evidence. *See State v. Simpson*, 327 N.C. 178, 190, 393 S.E.2d 771, 778 (1990). Even if the trial court erred by failing to sustain defendant's objection, defendant cannot show that she was prejudiced by the court's ruling. Boergert, Dickerson, and the victim's brother gave testimony suggesting that defendant owed the victim money, that the victim had begun to document that debt, and that the victim intended to seek repayment of the money defendant owed her. The State presented substantial evidence that the victim transferred to defendant a large amount of money between 1986 and 1988 by check, money order, and wire transfer; and defendant admitted receiving approximately $30,000 during this time period. In light of this evidence, defendant cannot show that there is a reasonable possibility that, had the trial court sustained her objection, a different outcome would have been reached at trial. *See* N.C.G.S. § 15A-1443(a).

[15] Defendant next argues that the court erred by permitting the prosecutor to pursue the following line of inquiry during cross-examination of defendant:

Q  Now, I believe you told [defense counsel] that on the night of July 24th and 25th you were real emotional and cried a lot?

A  No, sir.

Q  You didn't say that?

A  No, sir, I did not.

Q  You didn't say you were crying there at the scene?

. . . .

A  When the incident happened, yes sir, I was crying.

Q  I take it you cried more than you cried today?

A  Yes sir, I did.

[DEFENSE COUNSEL]: Objection to that question. That's a badgering question, your Honor.

COURT: Overruled.

Counsel may not "ask impertinent and insulting questions which he knows will not elicit competent or relevant evidence but are designed simply to badger and humiliate the witness." *State v. Britt,*

288 N.C. 699, 711, 220 S.E.2d 283, 291 (1975). In the present case the trial court could have reasonably concluded that the question at issue was not designed simply to badger and humiliate the witness but rather was designed to challenge the defendant's testimony on direct examination that she was hysterical and was crying at the scene of the crime. On the specific facts presented here, we conclude that the trial court did not abuse its discretion by overruling defendant's objection.

This assignment of error is overruled.

[16] By her next assignment of error, defendant contends that the trial court committed plain error by admitting the testimony of Howard Treadway notwithstanding the absence of an objection by defendant. During the State's rebuttal evidence, Treadway testified that defendant moved out of Treadway's home in April of 1988. The prosecutor asked Treadway why defendant moved, and Treadway's response suggested that he and defendant had a disagreement relating to a horse sale and that "there was some money missing." Treadway's testimony also suggested that defendant changed the beneficiary on his life insurance policy without his knowledge and that defendant took the accrued value of his life insurance policy without his consent. Defendant argues that this testimony was inadmissible under N.C.G.S. § 8C-1, Rule 405 and N.C.G.S. § 8C-1, Rule 608(b) as specific instances of bad character.

" 'Discrediting a witness by proving, through other evidence, that the facts were otherwise than [s]he testified, is an obvious and customary process that needs little comment. If the challenged fact is material, the contradicting evidence is just as much substantive evidence as the testimony under attack, and no special rules are required.' " *State v. Lambert*, 341 N.C. 36, 49, 460 S.E.2d 123, 131 (1995) (quoting 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 160 (4th ed. 1993)). Defendant placed her credibility at issue by testifying at trial. During her testimony she denied any wrongdoing with respect to the loan against Treadway's insurance policy and the checks made payable to Treadway. She stated that her actions were taken with Treadway's knowledge and with Treadway's consent. Treadway's testimony with respect to his life insurance policy contradicted defendant's testimony. Even though this testimony would not ordinarily be admissible, we conclude that it was properly admitted on rebuttal to discredit defendant's testimony.

Even if we assume *arguendo* that the portion of Treadway's testimony referring to the disagreement over a horse sale did not relate to any of defendant's testimony at trial and was inadmissible for any purpose, any error in failing to exclude this testimony did not amount to plain error. The State presented substantial evidence tending to impeach defendant's credibility. Defendant admitted on both direct examination and cross-examination that she had previously been convicted of insurance fraud. Furthermore, Treadway testified that he and defendant had settled the matter between themselves and that defendant subsequently moved back into his home. This assignment of error is overruled.

Defendant next contends that the trial court erred by permitting the prosecutor to make several improper arguments at the close of the guilt-innocence phase of the trial. Defendant did not object to any of these arguments; therefore, "they are reviewable only to determine whether they were so grossly improper that the trial court erred by failing to intervene *ex mero motu* to correct the errors." *State v. Gregory*, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996).

**[17]** Defendant contends it was improper for the prosecutor to argue that defendant's mother did not testify to avoid committing perjury. The State's evidence suggested that defendant and Boergert contacted defendant's mother after the murder and that she agreed to support any story that they might tell. No evidence was adduced at trial to suggest that defendant's mother declined to testify to avoid committing perjury, and the State concedes the argument to this effect was improper. However, a prosecutor is permitted to argue that the defendant did not contradict evidence presented by the State, *see State v. Hunt*, 339 N.C. 622, 641, 457 S.E.2d 276, 287 (1995); and the absence of contradictory evidence was the essence of the prosecutor's argument. Any impropriety in suggesting that defendant's mother did not take the stand in order to avoid committing perjury was not so grossly improper as to require the court to intervene *ex mero motu*.

**[18]** Defendant next argues that the prosecutor improperly travelled outside the record and injected his own personal opinion into the proceeding by assuring the jury that Boergert would be found guilty of second-degree murder and that his criminal conduct would "cost him." The evidence at trial tended to show that Boergert participated in the killing of the victim, that Boergert had been arrested and charged with second-degree murder, and that Boergert had not been

offered immunity or given any promises in exchange for his testimony. In his closing argument one of defendant's attorneys noted that Boergert had not spent one day in jail and asked the jury not to hold this against defendant. We conclude that the prosecutor's argument that Boergert's conduct would "cost him" was supported by the evidence presented at trial and that the prosecutor's remarks were properly made in response to defense counsel's suggestion that Boergert had not been punished for his role in the crime.

[19] Defendant next argues that the prosecutor travelled outside the record by making the following argument:

> I didn't ask [defendant about the number of car keys] because I knew [that the answer] would be, "May I explain? There were two car keys." You know that's what she'd say. Does that make sense?

Defendant's testimony tended to suggest that Boergert drove her car away from the scene of the crime and that Boergert asked her for her car keys just before they arrived at her trailer. The purpose of the prosecutor's argument was to show that it did not make any sense for Boergert to ask defendant for her car keys while he was driving her car and to question defendant's credibility by noting her manner of answering questions. While counsel should refrain from speculating as to how a witness would have answered an unasked question, the comment in this case did not misstate defendant's testimony or mislead the jury concerning what was in evidence. Accordingly, we conclude that the prosecutor's argument was not so grossly improper as to require the trial court to intervene *ex mero motu*.

[20] Finally, defendant argues that the following argument was grossly improper:

> I'm sure you've probably made the comment or heard folks say, "And why doesn't somebody do something" when you hear about a bad crime. Well, the buck stops right here today. Right here. Go back, deliberate, and come back with a verdict. "Verdict" means "truth." That's the gist of what it means in Latin. Go back and deliver a verdict that you can be proud of tonight, tomorrow, a week from now, a month from now, a year from now. This case deserves a verdict of "guilty," and as a spokesman on behalf of the State, we demand a verdict of "guilty."

Defendant argues that the prosecutor improperly urged the jury to "lend its ear" to anticrime sentiment in the community and to convict defendant in order to "do something" about crime. She cites *State*

*v. Erlewine,* 328 N.C. 626, 403 S.E.2d 280 (1991), and *State v. Scott,* 314 N.C. 309, 333 S.E.2d 296 (1985).

"[P]rosecutorial argument encouraging 'the jury to lend an ear to the community rather than a voice' is improper." *State v. Jones,* 339 N.C. 114, 161, 451 S.E.2d 826, 852 (1994) (quoting *Scott,* 314 N.C. at 312, 333 S.E.2d at 298), *cert. denied,* 515 U.S. 1169, 132 L. Ed. 2d 873 (1995). However, we have repeatedly stated that it is proper to urge the jury to act as the voice and conscience of the community. *See, e.g., State v. Campbell,* 340 N.C. 612, 635, 460 S.E.2d 144, 156 (1995), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 871 (1996); *Jones,* 339 N.C. at 161, 451 S.E.2d at 852; *State v. Brown,* 320 N.C. 179, 204, 358 S.E.2d 1, 18, *cert. denied,* 484 U.S. 970, 98 L. Ed. 2d 406 (1987). In *Scott* the prosecutor argued that "there's a lot of public sentiment at this point against drinking and driving, causing accidents on the highway." *Scott,* 314 N.C. at 311, 333 S.E.2d at 297. We held that the "argument was improper because it went outside the record and appealed to the jury to convict the defendant because impaired drivers had caused other accidents." *Id.* at 312, 333 S.E.2d at 298. In *Erlewine* we concluded that the prosecutor "crossed the line into impropriety by encouraging the [jurors] to follow [their] view of the sentiment of the community rather than the evidence, the law and their own views in acting as the voice and conscience of the community." *Erlewine,* 328 N.C. at 634, 403 S.E.2d at 284.

In the present case the prosecutor did not suggest that the jury should punish defendant based on community sentiment against murder rather than the evidence presented. The prosecutor's argument merely referred to community sentiment and urged the jury to render a verdict justified by the evidence and the law. Accordingly, we conclude that the argument at issue was proper.

This assignment of error is overruled.

**[21]** Defendant next contends that the trial court erred by instructing the jury that it could find defendant guilty of first-degree murder and second-degree arson under the theory of acting in concert. Defendant argues that the evidence, particularly Boergert's testimony, did not permit the jury to conclude that Boergert acted with premeditation and deliberation. Accordingly, defendant contends, citing *State v. Blankenship,* 337 N.C. 543, 447 S.E.2d 727 (1994), *overruled by State v. Barnes,* 345 N.C. 184, 481 S.E.2d 44 (1997), that defendant and Boergert could not have acted together pursuant to a common plan to commit a first-degree murder.

In *Barnes* the majority of this Court[1] adopted the following statement of the doctrine of acting in concert:

> [I]f "two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof."
>
> [*State v.*] *Erlewine*, 328 N.C. [626,] 637, 403 S.E.2d [280,] 286 [(1991)] (quoting [*State v.*] *Westbrook*, 279 N.C. [18,] 41-42, 181 S.E.2d [572,] 586 [(1971), *death sentence vacated*, 408 U.S. 939, 33 L. Ed. 2d 761 (1972)] (alterations in original).

*Barnes*, 345 N.C. at 233, 481 S.E.2d at 71. The evidence in the present case, taken in the light most favorable to the State, tended to show that defendant asked Boergert to help her "rough up" the victim, that Boergert went to the home of the victim's mother with the intent of helping defendant assault the victim, and that defendant and Boergert acted together to beat and stab the victim to death. Defendant provided Boergert with the wooden baton and the knife that Boergert used to beat and stab the victim, defendant personally beat the victim, and defendant personally inflicted the stab wounds that caused the victim's death. The State's evidence tended to show that defendant started a fire after killing the victim, took the lead in concocting and refining the "alibi story," and urged Boergert to "stick" to this story. Boergert helped defendant dispose of evidence and made statements to law enforcement officers indicating that he and defendant were together at the time of the killing. The State presented overwhelming evidence that defendant acted with premeditation and deliberation. Under *Barnes*, the evidence presented at trial was more than ample to permit the jury to conclude that the victim's murder was a natural or probable consequence of defendant's and Boergert's joint purpose to commit a crime. Moreover, the evidence, taken in the light most favorable to the State, was sufficient to show that defendant and Boergert acted together pursuant to a joint purpose to murder the victim. Accordingly, the trial court properly submitted first-degree murder on the basis of acting in concert.

---

1. Although the author of this opinion concurred in the majority opinion in *State v. Blankenship* and joined in the dissenting opinion in *State v. Barnes*, she is now bound by *stare decisis* to apply the *Barnes* precedent in the instant case.

**[22]** We also conclude that the trial court did not err by submitting arson on the basis of acting in concert. The evidence tended to show that Boergert and defendant acted together to kill the victim and that Boergert was present when defendant poured oil over the victim's body and set it on fire. Boergert subsequently drove defendant to defendant's trailer and assisted defendant in disposing of their bloody clothing. Defendant and Boergert agreed on an alibi, and both initially gave statements to the police denying any involvement in the crime. This evidence permitted the jury to find that defendant and Boergert acted together pursuant to a common plan or purpose to commit arson or that arson was a natural and probable consequence of their joint purpose to commit a crime.

This assignment of error is overruled.

**[23]** In a related assignment of error, defendant contends that the trial court's instructions on acting in concert allowed the jury to convict her of first-degree murder on the basis of premeditation and deliberation without requiring the State to prove that she had the requisite *mens rea* to commit that crime. Defendant argues, citing *Blankenship*, 337 N.C. 543, 447 S.E.2d 727, that the trial court erred by including the phrase "either acting by herself or together with another" in its instructions on each of the elements of first-degree murder relating to specific intent. Defendant argues that the trial court's instructions permitted the jury to find that defendant acted with specific intent to kill based solely on findings that she acted together with Boergert and that Boergert acted with specific intent. Defendant did not object to the form of the instructions at trial and, therefore, relies on plain error.

Under the statement of the doctrine of acting in concert adopted by this Court in *Barnes*, 345 N.C. 184, 481 S.E.2d 44, defendant's argument is without merit. Moreover, even if we were to apply *Blankenship* and its progeny to the present case, after reviewing the instructions given by the trial court in the present case, we would reject defendant's argument. The instructions made it clear that defendant could have acted either alone or with another to commit the crime and that, in order to convict defendant, defendant herself must have had the requisite specific intent.

This assignment of error is overruled.

By her next assignment of error, defendant contends that the trial court committed plain error by giving a reasonable doubt instruction

that reduced the State's burden of proof below the standard required by the Due Process Clause. We disagree.

The trial court defined reasonable doubt in the following manner:

[A] reasonable doubt is a doubt based on reason and common sense arising out of some or all of the evidence that has been presented, or a lack of that evidence, as the case may be. And proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt as to one or more of these charges to a moral certainty of the truth of the charge. A reasonable doubt, as that term is employed in the administration of criminal law, is an honest, substantial misgiving generated by the insufficiency of the proof, an insufficiency which fails to convince your judgment and conscience and satisfy your reason as to the guilt of the accused. A reasonable doubt is not a doubt suggested by ingenuity of counsel or by your own ingenuity not legitimately warranted by the testimony nor is it one borne of a merciful inclination or disposition to permit a defendant to escape the penalty of the law, or one prompted by sympathy for [her] . . . or anyone connected with her.

Defendant argues that the instruction given by the court incorrectly charged the jury on the law and unconstitutionally reduced the State's burden of proof. "Absent a specific request, the trial court is not required to define reasonable doubt, but if the trial court undertakes to do so, the definition must be substantially correct." *State v. Miller*, 344 N.C. 658, 671, 477 S.E.2d 915, 923 (1996). "[N]o particular formation of words is necessary to properly define reasonable doubt, but rather, the instructions, in their totality, must not indicate that the State's burden is lower than 'beyond a reasonable doubt.' " *State v. Taylor*, 340 N.C. 52, 59, 455 S.E.2d 859, 862-63 (1995). "[T]he proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." *Victor v. Nebraska*, 511 U.S. 1, 6, 127 L. Ed. 2d 583, 591 (1994), *quoted in State v. Bryant*, 337 N.C. 298, 305, 446 S.E.2d 71, 75 (1994). We conclude that the instruction given by the court, taken as a whole, correctly conveyed the concept of reasonable doubt to the jury.

[24] Defendant first argues that the instruction erroneously failed to charge on doubt arising out of insufficiency of the evidence. The instruction on reasonable doubt informed the jury that a reasonable doubt may arise out of "some or all of the evidence that has been

presented, *or a lack of that evidence,* as the case may be" and that a reasonable doubt may be generated by an *"insufficiency of the proof."* (Emphasis added.) The instruction given by the court, taken as a whole, properly informed the jury that reasonable doubt could arise out of insufficiency of the evidence.

**[25]** Defendant argues that the court's instruction failed to qualify the words "ingenuity of counsel" with the words "not legitimately warranted by the testimony." The court instructed the jury, in pertinent part, that a "reasonable doubt is not a doubt suggested by ingenuity of counsel or by your own ingenuity not legitimately warranted by the testimony." Defendant's suggestion that the court precluded the jury from considering ingenuity of counsel legitimately warranted by the testimony is without merit. We also reject defendant's argument that the court erred by instructing the jury as to what reasonable doubt was "not." This Court has approved instructions containing language virtually identical to this portion of the trial court's instruction, *see, e.g., State v. Baker,* 338 N.C. 526, 563, 451 S.E.2d 574, 596 (1994); and there is nothing in the court's description of what reasonable doubt was "not" that could be interpreted in a manner which would lower the State's burden of proof.

**[26]** Defendant argues that the court's instruction used the phrases "moral certainty" and "honest substantial misgiving" in a manner that unconstitutionally reduced the State's burden of proof. We disagree. The trial court instructed the jury that it must be fully satisfied or entirely convinced of defendant's guilt "to a moral certainty of the truth of the charge." The term "moral certainty" was placed in context by other portions of the instruction, which informed the jury that reasonable doubt could arise out of the evidence, the lack of evidence, or the "insufficiency of the proof." *See White,* 340 N.C. at 278, 457 S.E.2d at 849. We conclude that the use of the term "moral certainty" did not reduce the State's burden of proof below the constitutional standard.

The use of the term "honest substantial misgiving" similarly did not render the instruction constitutionally infirm. In *Bryant* the trial court instructed the jury, in pertinent part, that

[a] reasonable doubt, as that term is employed in the administration of criminal law, is *an honest substantial misgiving* generated by the insufficiency of proof. An insufficiency which fails to convince your judgment and confidence and satisfy your reasons as to the guilt of the defendant.

*Bryant,* 337 N.C. at 302, 446 S.E.2d at 73. We concluded that the term "substantial" had been used to refer to the existence of doubt rather than the magnitude of doubt and that there was "no concern that its use would have been interpreted to overstate the degree of doubt required for acquittal." *Id.* at 306, 446 S.E.2d at 75. The portion of the trial court's instruction using the term "honest substantial misgiving" is similar to the instruction given by the court in *Bryant,* and the instruction did not overstate the degree of doubt required for acquittal.

We conclude that the instruction on reasonable doubt, taken as a whole, correctly conveyed the definition of reasonable doubt and that it is not reasonably likely that the jury applied the instruction in an unconstitutional manner. This assignment of error is overruled.

[27] Defendant next assigns error to the finding of the aggravating factor that the arson involved property damage causing great monetary loss. N.C.G.S. § 15A-1340.4(a)(1)(m) (1988) (repealed effective 1 October 1994; reenacted as N.C.G.S. § 15A-1340.16(d)(14) effective 1 October 1994). Defendant argues that there was insufficient evidence that the arson involved damage causing great monetary loss. In particular, defendant suggests that no evidence showed that the house had any monetary value before the fire. We disagree.

The State presented evidence tending to show that the Paynes' house was a frame, single-story house with two bedrooms, a living room, a kitchen, a den, and a porch. Ava and Vonno Payne resided in the house. Vonno Payne testified that the house had a replacement value of $80,000 and that the house "was a complete loss." An assistant fire marshall testified that it took firemen two hours to suppress the flames and stated that "one-third of the house . . . had flames coming through the roof." The State presented ten photographs showing the house as it appeared before and after the fire. This evidence was more than ample to permit the court to find that the offense involved property damage causing great monetary loss. *See State v. Bryant,* 318 N.C. 632, 350 S.E.2d 358 (1986). Defendant's assignment of error is overruled.

## MOTION FOR APPROPRIATE RELIEF

[28] On 5 February 1993 defendant filed with this Court a motion for appropriate relief seeking a new trial on the basis of newly discovered evidence. On 11 March 1993 this Court entered an order remanding defendant's motion to the Superior Court, Buncombe County. An evidentiary hearing on defendant's motion was held at the 13

**STATE v. BISHOP**

[346 N.C. 365 (1997)]

December 1993 Criminal Session of Superior Court, Buncombe County. On 6 May 1994 Judge Downs entered an order denying defendant's motion for appropriate relief. We conclude that the court's findings of fact support its conclusions of law and that the court did not err in denying defendant's motion.

Ten days after the jury found defendant guilty of murder, Nelson Kelley contacted defendant's attorneys. Kelley claimed that he was an eyewitness to the murder and that Boergert was solely responsible for the victim's killing. At the evidentiary hearing Kelley testified that he was employed as an Encyclopaedia Britannica salesman on 24 July 1988. At 11:15 p.m. on that night, Kelley drove to the Paynes' house to follow-up on information which indicated that the Paynes were interested in purchasing a set of encyclopedias. Defendant's evidence suggested that Kelley was an extremely aggressive and successful salesman and that he frequently made late-night contact with potential customers.

Kelley testified that he walked onto the Paynes' porch, knocked on the front door, and heard a woman screaming. Kelley looked through the living room window and saw Boergert beating the victim while defendant attempted to hold Boergert's arm back. Kelley heard defendant yell, "[p]lease don't, please don't," and "[s]top, stop, you're killing her." Kelley left the scene without attempting to help the victim. As he drove away Kelley tried to use his cellular phone to call for assistance but was unable to use his phone. Kelley did not contact the police or attempt to obtain assistance for the victim on the night of the killing. Kelley testified that he contacted several friends to ask them for advice on how to proceed, and several witnesses testified that Kelley told them that he had seen a domestic assault at about that time.

Kelley made no attempt to contact the police, defendant's attorneys, or anyone else involved in defendant's case until after defendant had been convicted of murder. Kelley claimed that he did not know that he was a witness to a murder until he read about defendant's trial in 1992. Even after realizing that he had witnessed a murder, Kelley declined to contact the authorities. Kelley stated that his reason for not coming forward was that, from what he read in the newspaper, "that overwhelming evidence was in favor of [defendant], the lady that was trying to save the life of [the victim]."

The State's evidence tended to discredit Kelley's testimony. Ava Payne and her stepdaughter gave testimony which tended to show

that Kelley could not have seen the beating from the Paynes' front porch. Payne testified that she owned two sets of encyclopedias and that she had not requested any information concerning Encyclopaedia Britannica. Several witnesses testified that Kelley told them what he claimed to have seen and asked them to sign affidavits that he was selling encyclopedias in the vicinity of the Paynes' house on the night of the killing. Witnesses stated that Kelley was given to "exaggeration" and "distortion," that he "handled the truth recklessly," and that he had a tendency to overdramatize "things."

"The decision of whether to grant a new trial in a criminal case on the ground of newly discovered evidence is within the trial court's discretion and is not subject to review absent a showing of an abuse of discretion." *State v. Wiggins*, 334 N.C. 18, 38, 431 S.E.2d 755, 767 (1993).

Our usual standard for evaluating motions for a new trial on the grounds of newly discovered evidence requires a defendant to establish seven prerequisites:

1. That the witness or witnesses will give newly discovered evidence.

2. That such newly discovered evidence is probably true.

3. That it is competent, material and relevant.

4. That due diligence was used and proper means were employed to procure the testimony at the trial.

5. That the newly discovered evidence is not merely cumulative.

6. That it does not tend only to contradict a former witness or to impeach or discredit him.

7. That it is of such a nature as to show that on another trial a different result will probably be reached and that the right will prevail.

*State v. Britt*, 320 N.C. 705, 712-13, 360 S.E.2d 660, 664 (1987).

We have carefully reviewed the court's findings of fact and its conclusions of law. The court's findings of fact support its conclusions (i) that Kelley's testimony was probably not truthful and (ii) that the testimony was not of such a nature as to show that a different result would probably be reached at another trial. The court

specifically found that the State's cross-examination of Kelley and the testimony of other witnesses "tended to substantially question his character for truthfulness and veracity." This finding is supported by ample evidence in the record, and it supports both the conclusion that Kelley's testimony was not true and that the testimony was not of such a nature as to show that a different result would probably be reached at another trial. Defendant has failed to show that the trial court abused its discretion in denying defendant's motion for appropriate relief. Accordingly, this assignment of error is overruled.

We conclude that defendant received a fair trial, free from prejudicial error, and that the court properly denied defendant's motion for appropriate relief.

NO ERROR.